BOARD OF REVIEW, etc., et al. v. MID-CONTINENT PETROLEUM CORP.

No. 29937. May 25, 1943.

Rehearing Denied Sept. 14, 1943.

*141 P. 2d 69.*

Hughey Baker and Raymon B. Thomas, both of Tulsa, and Mac Q. Williamson, Atty. Gen., for plaintiffs in error.

J. C. Denton, R. H. Wills, J. H. Crock-

er, I. L. Lockewitz, and J. P. Greve, all of Tulsa, for defendant in error.

GIBSON, V. C. J. This action was instituted in the district court of Tulsa county by Mid-Continent Petroleum Corporation against the Board of Review and William R. Cox to review an order of said board awarding Cox unemployment compensation pursuant to the Unemployment Compensation Law of 1936 (ch. 52, S. L. 1936). The court vacated the order of the board, and this appeal followed (sec. 6).

In January, 1939, Cox filed his claim for compensation with the proper authorities, naming said corporation as his last employer (sec. 7 (c)), and stating the reasons for his separation from his employment to be "out on strike. Received letter dismissal."

On February 1, 1939, the claims deputy of the State Labor Department, acting pursuant to his authority under the act, disallowed the claim for the duration of the strike. Subsequently, the Board of Review, after hearing evidence, reversed the action of the claims deputy and entered its order of award as above stated. Thereupon the corporation instituted this proceeding in district court for a judicial review of the order (sec. 6 (h)).

The cause was heard and determined on the record and evidence transcribed from the board.

The ground assigned by the corporation in contesting Cox's claim for compensation was that his unemployment was due wholly to stoppage of work occasioned by a labor dispute at the company's plant where he had been employed, and not to any discharge by the corporation, all of which, it is alleged, disqualified Cox for any benefits under the act. Sec. 5 (c) (2) (d), parags. 1, 2.

Said section 5 is in part as follows:

"Section 5. An individual shall be disqualified for benefits: . . .

"(2) (d) For any week in which it is found by the Commissioner that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the Commissioner that:

"1. He is not participating in or financing or directly interested in the labor dispute which cause the stoppage of work; . . ."

According to language of the act, refusal to accept employment, which is a disqualification, may be excused even if the "unemployment is due to a stoppage of work which exists because of a labor dispute at the factory . . . at which he is or was last employed," unless the claimant participates in, finances, or is directly interested "in the labor dispute which cause the stoppage of work." In other words, the individual cannot receive benefits so long as his unemployment is due to a stoppage of work which exists because of a labor dispute in which he is participating.

The record shows that Cox was unemployed because of a labor dispute in which he was engaged. He and some 200 other employees of the corporation went out on strike; and the evidence is that he would not have accepted employment with the corporation had employment been offered him. Such was the finding of the district court. And there was no evidence to the contrary sufficient to support the order of the Board of Review.

But, Cox insists that his right to benefit is not impaired by those facts for the reason that under the provisions of the act, supra, he is not to be so denied unless the labor dispute caused a stoppage of work at the plant, a substantial shutdown, where the strike took place. In this respect it is urged that no substantial stoppage of work or shutdown took place, but, instead, the plant continued to operate at its normal capacity.

It is further urged that since the plant was not shut down, and Cox had complied with all other requirements of the act, such as offering his application for

other work, etc., he is clearly entitled to compensation.

The Attorney General, who appears for the Board of Review (6 (h)), does not share the above views as propounded by Cox's counsel. The Board of Review, says the Attorney General, allowed Cox compensation on the ground that the letter of dismissal mentioned in Cox's claim and dated January 5, 1939, constituted a discharge entitling Cox to compensation after that date and so long as he complied with other requirements of the act. The Attorney General's views are thus briefly stated by him:

" . . . The Board of Review under the Oklahoma Unemployment Compensation Law (article 2, chapter 52, Oklahoma Session Laws 1939), during 1939, decided *two groups* of cases involving approximately *two hundred claimants in each group* that arose out of a certain labor dispute at the refinery of the Mid-Continent Petroleum Corporation, and in which the Mid-Continent Petroleum Corporation was the last employer.

"In *one group* of these cases of which Burgin v. Board of Review et al. (No. 29979 in this court) is a representative case, the *Board of Review,* and, in turn, the district court on appeal, *denied to the claimants benefits* under the Oklahoma Unemployment Compensation Law by reason of section 5 (c) (2) (d), chapter 52, Oklahoma Session Laws 1936, which provides:

" 'An individual shall be disqualified for benefits: . . .

" '(2) (d) For any week in which it is found by the Commissioner that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the Commissioner that: . . .'

"In *the other group* of cases of which the above captioned cause is a representative case, the *Board of Review allowed* the claimants *benefits* by reason of a certain letter written by the Mid-Continent Petroleum Corporation to the claimants involved on January 5, 1939. (See page 11 of defendant in error's brief.)

"The lower court in the Burgin Case sustained the decision of the Board of Review in disallowing benefits, and in effect held that 'stoppage of work' as used in section 5 (c) (2) (d), supra, referred to stoppage by the claimant or worker, and not to stoppage at the factory, establishment or other premises at which the claimant or worker was last employed.

"During the trial of the case the attorneys for the claimants or workers took the position that the term 'stoppage of work' as contained in section 5 (c) (2) (d), supra, referred to 'stoppage of work' at the factory, establishment or other premises at which the claimant or worker was last employed.

"In the Cox Case (as in the Burgin Case) the Attorney General appeared in district court on behalf of the Board of Review, and in support of the board's decision took the position that the aforementioned letter written by the Mid-Continent Petroleum Corporation on January 5, 1939, constituted a letter of discharge and that therefore the claimants or workers were rightfully entitled to benefits.

"The attorneys for the claimants or workers also took the position in this case, as in the Burgin Case, that they were entitled to benefits by reason of the meaning of the term 'stoppage of work' as used in section 5 (c) (2) (d), supra, *even if the aforementioned letter could not be construed to be a letter of discharge.* It is upon this point that the Attorney General cannot sanction and here specifically disclaims the statement and the logic of counsel for plaintiff in error, Cox. We never at any time took such a stand, and do not now. . . .' "

Considering first the question whether "stoppage of work" as used in the act refers to the individual work of the employee or to the operation of the plant, we agree fully with the position of the corporation and the Attorney General that the provision refers to the individual work of the employee.

Counsel for Cox state that administrative officers and text writers say that "stoppage of work," as used in similar

statutes of other states and in Great Britain, means a shutdown at the factory where the workman was employed. Thus they arrive at the conclusion that unless the plant actually stops operation by reason of the labor dispute, the striker who remains out may receive compensation for unemployment. Their conclusion is not supported by the decision of any court of last resort to which our attention has been called.

The reasoning of the foregoing officers and writers is not very impressive when applied to our own Act of 1936. Had the Legislature intended to refer to the shutdown of the plant and not to the cessation of work by the employee, the term "stoppage of operation" would have been far more appropriate. It seems to us that the word "work" ordinarily refers to or comprehends the activities of the workman, not the operation of a factory. That portion of the act, supra, which disqualifies a workman for benefits "for any week in which . . . his total or partial unemployment is due to a stoppage of work **which exists because of a labor dispute** at the factory" refers, with respect to the workman, to his unemployment and to his stoppage of work. A strike in the labor sense is generally defined as a stoppage of work by common agreement of workingmen. 15 C.J.S. 1008, § 11. That was the definition evidently in the mind of the Legislature; the term "stoppage of work" was considered as synonymous with "strike."

Were we to adopt the view of Cox's counsel, we should hold that the Legislature intended that the unemployment fund be used to support strikes. There is nothing in the act to indicate such an intention. Witness the purpose of the act as therein declared:

"For the compulsory setting aside of unemployment compensation funds to be used for the benefit of persons unemployed through no fault of their own."

Whether a person in good health and in possession of his faculties is ever unemployed through no fault of his own has long been a topic of heated debate, but, regardless of the disagreement that invariably arises in such case, one who is out on strike can hardly be said to be unemployed through no fault of his own. Whether his cause is just or unjust is beside the point.

In Walter Bledsoe Coal Co. v. Review Board, etc., 46 N.E. 2d 477, the Supreme Court of Indiana, in paragraph 2 of the syllabus, held as follows:

"The word 'fault' as used in section of Employment Security Act declaring the purpose of the Act to be to provide benefits for persons unemployed through no fault of their own, etc., does not mean something worthy of censure, or that under wartime conditions a person with regular employment with which he has been satisfied may voluntarily quit work and seek higher pay and receive benefits until he finds a position more to his liking or decides to return to his previous employment, but means failure or volition. Burns' Ann. St., secs. 52-1501."

And in the opinion it was said:

"Appellees say that the word 'fault' means 'something worthy of censure.' We cannot believe that the word as used in the statute was intended to have such a meaning. We cannot believe that it was intended that, under wartime conditions such as now exist, a person with regular employment with which he has been satisfied may voluntarily quit work and go forth seeking higher pay in a munitions factory, and make claim for and receive compensation benefits until he finds a position more to his liking or decides to return to his previous employment. It must be concluded that such unemployment did not occur through no fault of his own. Thus 'fault' must be construed as meaning failure or volition. This construction is consistent with the provision that there shall be no benefits paid if unemployment is due to a stoppage of work because of a labor dispute. It is perfectly legal for employees to contend for better wages and working conditions and to refuse work if their demands are not complied with, and it cannot legally be said that such action is worthy of censure or that it constitutes wrongdoing. It must be concluded that the purpose of the act was to provide benefits to those who were involuntarily out of employment, and not to finance those who were willingly and deliberately refusing to work be-

cause of a failure of their employers to accede to demands for higher wages. . . .

"While we have not before been called upon to consider this statute, the question is not new, and has been passed upon in many states where the statutes are substantially identical, and in cases in which the facts are substantially identical with those of the case at bar. We find strong support for the conclusion we have reached in the language of the opinions. See Ex parte Pesnell (1940) 240 Ala. 457, 199 So. 726; Department of Industrial Relations v. Pesnell (1940) 29 Ala. App. 528, 199 So. 720, certiorari denied by United States Supreme Court, 313 U. S. 590, 61 S. Ct. 1113, 85 L. Ed. 1545; Barnes et al. v. Hall (1941) 285 Ky. 160, 146 S. W. 2d 929; Miners in General Group et al. v. Hix et al. (1941) 123 W. Va. 637, 17 S. E. 2d 810; Dallas Fuel Co. v. Horne et al. (1941) 230 Iowa, 1148, 300 N. W. 303; Block Coal & Coke Co. et al. v. United Mine Workers et al. (1941) 177 Tenn. 247, 148 S. W. 2d 364, 149 S. W. 2d 469 . . . "

In Knox Consol. Coal Corp. v. Review Board (Ind. A.) 43 N. E. 2d 1019, the Appellate Court of Indiana held:

"The purpose of the Employment Security Act is to promote the general welfare by protecting the homes and families of those who become unemployed through no fault of their own, and the section providing that an individual shall be ineligible for benefits for any week with respect to which unemployment is due to a stoppage of work which exists because of a labor dispute at the factory at which he was last employed intends to withhold benefits of the act from those who bring about their own unemployment by bringing about or participating in a labor dispute. Burns' Ann. St. secs. 52-1501, 52-1506(f) (3)."

The amicus curiae brief cites two judicial decisions that would appear to support Cox's argument. One is by an inferior trial court in Oregon; the other by an inferior trial court in Washington. But the decisions of courts of appellate jurisdiction, or of last resort, to which our attention has been called, express a contrary view. Miners in General Group v. Hix (W. Va.) 17 S. E. 2d 810; Bodinson Mfg. Co. v. California Employment Commission (Cal. App.) 101 P. 2d 165.

The Miners Case, above, holds that the words "stoppage of work is due to labor dispute" apply to the individual worker and, generally, a labor dispute can exist only between individual workers and their employer. In this case the large mines affected were closed down except for maintenance work, but some of the smaller mines continued to operate.

The California statute which was involved in the Bodinson Case, above, is not entirely like our own. Under that statute an individual is not eligible for benefits if he left his work because of a trade dispute, not because of a stoppage of work caused by a labor dispute. The case is authority for the proposition that an individual is not eligible for benefits so long as he remains unemployed by reason of a labor dispute in which he is engaged.

The case of In re Steelman, 219 N. C. 306, 13 S. E. 2d 544, involved a statute identical in language with our own. The court held that strikers were not entitled to benefits so long as they remained on strike and the plant remained idle. The court took the attitude that strikers who remained idle after the plant resumed operations might become eligible for benefits; that the question depended upon the circumstances in each individual case, and was for the original determination of the commission. The question was not before the court for determination. It was there said that the commission must first pass on the merits of each case. The court's attitude seemed to be that if the striker remained unemployed after the plant resumed operations, he might be entitled to benefits under the act if he was unemployed "through no fault of his own." The question here under consideration actually was not determined by the court.

Section 4 of the act in question is, in part, as follows:

"Section 4. An unemployed individual shall be eligible to receive benefits with respect to any week only if the commissioner finds that: . .

"(c) He is able to work, and is available for work."

In the circumstances of this case we do not think it can be said that the claimant Cox was "available for work." He had left his employment voluntarily; he remained away from it of his own volition and would not return to work except upon such terms and under such conditions as he might name and stipulate.

We now consider the letter of January 1, 1939, allegedly dismissing Cox, and the effect thereof with reference to his status as an unemployed individual within the meaning of the act. The board's decision awarding benefits to Cox was based on that letter. Its opinion was that the purpose and effect thereof was to discharge him from further services with the company, and that he thereupon became eligible for benefits under the act as an unemployed individual.

The letter stated that the corporation had decided to discharge each and every employee who, in connection with the strike, had committed criminal offenses of a designated character, and continued as follows:

"We have been furnished with convincing evidence that you are guilty of having committed one or more of the above acts, and therefore, this is to notify you that you are hereby discharged, for cause, as an employee of the Mid-Continent Petroleum Corporation.

"In reaching the conclusion to discharge you, we have not taken into consideration the fact, if it is a fact, that you are affiliated with any Union; and we have fully considered and recognized the fact of your legal right to participate in the present strike, to lawfully picket, and to engaged in any and all other lawful acts for the accomplishment of the purpose or purposes of said strike.

"If you have any reason to question the evidence upon which we have based your discharge, you may either personally or through your representative interview your department head or superintendent and we will be glad to rectify any error which we might have made."

It is urged that the letter was merely a conditional dismissal, plainly in conformity with the contract existing between Cox's union and the corporation wherein it is provided that "an employee is subject to dismissal for cause. He will be informed of the reason of such dismissal and given the opportunity, either personally or through his representative, to interview his department head or superintendent." Appeals to the general management of the company were authorized.

Cox made no attempt to comply with the letter or to defend himself against the accusations therein. No hearing was ever had or requested, and the dismissal remained incomplete, and was never determined according to the provisions of the union contract.

We fail to see how Cox, in the face of those circumstances, can claim that he was discharged. The letter had nothing to do with his unemployment; that was, and continued to be, the result of the labor dispute in which Cox was engaged. And, under the statute, so long as that condition exists, Cox cannot receive benefits.

Though the letter did not constitute a discharge, Cox was at liberty to resign and thereupon consider his employment at an end at any time. He now says that his employment did end with the letter; that he considered himself dismissed. But his subsequent actions will not substantiate the assertion that he ceased to be an employee. He was out on strike against the corporation, and a strike can take place and be carried on only by an employee against his employer. In the face of the record before us, the conclusion is inescapable that Cox first was without work by reason of a labor dispute between him and his employer, and that he continued as a party to such dispute up to the time his claim was heard by the board.

It is further urged that Cox, in any event, may not be denied benefits for more than five weeks if he voluntarily

ceased working (sec. 5 (a)), or for more than nine weeks if he was discharged for misconduct (sec. 5 (b). But those two subdivisions contemplate a severance of the relationship of employer and employee.

Since Cox at all times was participating in the labor dispute which caused the stoppage of work, he was not eligible for benefits under the act. The evidence was not sufficient to support the order of the Board of Review to the contrary (sec. 6 (i)).

The judgment of the district court is affirmed.

CORN, C. J., and OSBORN, BAYLESS, WELCH, and HURST, JJ., concur. DAVISON, J., concurs specially. RILEY and ARNOLD, JJ., dissent.

---

DAVISON, J. (specially concurring). I concur specially in the majority opinion. I agree that controlling importance must be attached to the language used by the Legislature in the Unemployment Compensation Act of 1936, and the problem before us must be solved on the basis of that language. However, it is my opinion that the sentence construction of the language used claims a greater degree of consideration than does the meaning of the word "work" as used in the governing provision of the act.

Legislation of this character is comparatively new in this country. The courts of last resort which have spoken on the interpretation of comparable clauses are not in accord. In many instances the difference of opinion can be accounted for by differences in the wording of the statutes; in other instances it cannot. Some courts have gone far afield in searching for aids of interpretation. I shall not in this concurring opinion attempt to analyze the various judicial impressions on the subject, many of which are alluded to in the other opinions filed herein. It is my view that the best solution of the problem lies in a careful analysis of the language used by our Legislature.

The legislative branch of the government is authorized to determine the policy of the law within constitutional limits. Primarily, then, the policy and purpose of a law is a legislative and not a judicial question. Cognizance of the purpose to be accomplished by the law or consideration of the best method of accomplishing that purpose present judicial questions when the language used by the Legislature is obscure in meaning or when the literal application leads to absurd results. In other words, when the question before the court is one of statutory construction we first look within the four corners of the statute to determine the legislative intent. The natural meaning and grammatical arrangement of the words are matters of primary importance. Shaw v. Grumbine, 137 Okla. 95, 278 P. 311; Falter v. Walker, 47 Okla. 527, 149 P. 1111.

The question before us is whether a workman who is not working by reason of a labor dispute in which he is participating can draw unemployment compensation if the factory or establishment where he was working is continuing to operate or has resumed operations on substantially a full production basis. It is conceded that if the factory has ceased to operate by reason of the dispute, he could not.

In considering this question it is appropriate to observe that we are dealing with a statute enacted before our entrance into the present war as applied to a situation which likewise arose in time of peace. We are therefore not concerned with the power of the executive branch of the government to deal with labor disputes in time of war, nor the question of the extent to which legislation appropriate in time of peace may be suspended by executive action in time of war.

In framing the legislation now before us, it was proper for the Legislature to consider whether the benefits of unemployment insurance should be extended to those engaged in labor disputes and out of employment for that reason. It may also be assumed that it

would have been proper for it to have so framed the act that benefits would accrue to unemployed workmen only when the labor dispute resulted in a stoppage of work at the factory, that is, a cessation of the operation of the factory. Or it may be assumed that the Legislature could have indicated that the cessation of work must be due to a strike as distinguished from a lockout, thus emphasizing the voluntary character of the unemployment as the basis for the receipt of benefits.

The question, however, is not what the Legislature could or should have done. It is, what it did.

By section 5 of the Oklahoma Unemployment Compensation Law (ch. 52, S. L. 1936) it was provided in part:

"An individual shall be disqualified for benefits:

". . . For any week in which it is found by the Commissioner that his total or partial unemployment is due to a stoppage of work which exists *because of a labor dispute at the factory*, establishment or other premises at which he is or was last employed, . . ." (Emphasis ours).

The term "stoppage of work" which appears in the act is sufficiently general in its meaning as commonly understood to comprehend either the act of the individual in ceasing to work or the condition of a factory in which all work has been stopped. What it means in this particular case depends upon the manner in which it was used in the act.

In this case it is said by the employer to allude to a cessation of work at the factory by reason of the subsequent appearance in the sentence of an allusion to the "factory, establishment or other premises" where the worker had been employed. This argument treats the designation of place as it appears in the statute as identified with the "stoppage of work." It was not so used by the Legislature. On the contrary, it is identified with the labor dispute and designates the place where the labor dispute exists. It reads, "because of a labor dispute at the factory," etc. The

words "at the factory" are words of limitation as to place. As such they ordinarily refer to and limit the last antecedent. The applicable rule was stated and applied in Board of Trustees of Firemen's Relief and Pension Fund, City of Muskogee, v. Templeton, 184 Okla. 281, 86 P. 2d 1000, where we said in paragraph 4 of the syllabus:

"A limiting clause in a statute is generally to be restrained to the last antecedent, unless the subject matter requires a different construction."

See, also, Baum v. City of Oklahoma City, 190 Okla. 618, 126 P. 2d 249.

The last antecedent in the statute before us is the "labor dispute," not the "stoppage of work."

A labor dispute may exist at the factory without a "shutdown." Of course, if a labor dispute does result in a shutdown or stoppage of operations at the plant or factory, it may result in a stoppage of work for individuals not involved in the labor dispute. Individuals not so involved are the subject of consideration by the Legislature in the statutory provisions immediately succeeding the above-quoted language.

It is thus my opinion that the thing which must exist at the factory is, under the terms of the statute, the labor dispute, not the stoppage of work; that when the labor dispute exists at the factory resulting in a *stoppage of work* by the individual, he is disqualified to receive benefits if he is a participant in the labor dispute and not working by reason of his own voluntary desire, regardless of whether the factory stops or does not stop operating.

It is interesting to note that the particular section and sentence now before us has been twice changed by subsequent sessions of the State Legislature, no doubt for the purpose of eliminating controversy in connection with situations of the character now before us. In 1939, by section 3 of chapter 52, S. L. 1939, it was provided in part:

"An individual shall be disqualified for benefits . . . :

"For any week in which it is found by the Commissioner that his total or partial unemployment is due to a labor dispute at the factory, establishment or other premises at which he is or was last employed; . . ."

Notice that the limiting words "at the factory," etc., were retained in the statute as was the antecedent "labor dispute," but the more remote term "stoppage of work" was eliminated from the sentence, thus avoiding the confusion which constitutes the basis of this controversy wherein it is sought to make the words of limitation refer to a remote antecedent.

Subsequently, the 1941 Session of the Legislature, by section 6 of chapter 69, S. L. 1941, again amended the portion of the statute under consideration. The provision as amended read:

"An individual shall be disqualified for benefits:

"For any week with respect to which the Commission finds that his unemployment is due to a stoppage of work which exists at the factory, establishment or other premises at which he is or was last employed, because of a labor dispute; . . ."

Notice that this Legislature struck "labor dispute" as the immediate antecedent of the limiting words "at the factory" and inserted in lieu thereof the words "stoppage of work." The Legislature has thus adopted a sentence construction of a different meaning from that formerly employed.

Undoubtedly, under this later statute with its re-arranged sentence construction, "stoppage of work . . . at the factory" is the condition which prevents the employee who is participating in a labor dispute from receiving the benefits of unemployment compensation. The clear-cut meaning of this last expression of the Legislature seems to have constituted a major factor in moulding the dissenting views of Mr. Justice Arnold, who regards the 1941 act as a legislative return to the policy of the 1936 act after an interlude under a different policy prescribed by the 1939 act.

This deduction is not supported by the language chosen to express the legislative intent. The Legislature in the 1941 act did not re-adopt the sentence structure of the 1936 act, but, on the contrary, chose a distinctly different sentence arrangement; one which, in recognition of the established rule with reference to the next preceding antecedent, declared the law to be that which the claimant herein is of the opinion it should have been in the first instance. The change is, of course, inapplicable to this controversy.

The method of accomplishing the change was and is appropriate. The Legislature determines the policy of the statutory law. We apply it.

The present case does not in any way involve the right to strike. If such a question were involved, I feel confident that my associates would fully agree that a properly conducted strike constitutes a lawful method of exerting economic pressure. Our lawmakers and courts have by past laws and interpretation thereof made it possible for the great majority of our people to improve their standard of living and working conditions by making it proper and lawful for employees to lawfully bargain collectively and to use all legal methods, including the strike, for the purpose of relieving themselves from what they deem to be burdensome, unjust, unfair, oppressive, and improper labor conditions, and to the end that the working classes may receive proper and adequate wages for their toil.

The Unemployment Compensation Act is a governmental aid to the working class. It may or may not aid them in instances where unemployment is directly connected with labor disputes, depending upon the disposition of the Legislature.

Because of the sentence construction of the language employed by the Legislature in 1936, I concur specially in the majority opinion.

I am authorized to state that Justices OSBORN, WELCH, and HURST concur

in the views herein expressed.

---

ARNOLD, J. (dissenting). Where the language used by the Legislature is plain, unambiguous, and subject to but one construction, no interpretation to determine its intention is necessary; however, where the situation is otherwise, it is the sole function of the court to determine the intention of the Legislature from the language used and all other existing circumstances and so construe the language used as to effectuate its intention if possible. In the first place I do not believe the language used by the Legislature is susceptible of the construction placed on it by the majority, and in the second place all the circumstances, and particularly the other provisions of the act, indicate unmistakably a contrary intention on the part of the Legislature from that determined by the majority. It appears to me that the majority have seized upon poor context, if it be such, or inexact technical usage of words as furnishing an opportunity to change the evident policy of the Legislature. Whether the legislation is good or bad, as such, according to our personal views, this should not be done. There has been no determination that the strike in question was just or unjust, and we should just try to determine from the language used and all other circumstances what the Legislature intended; when its intention is determined it governs.

Admitting for the sake of argument that the language used by the Legislature is ambiguous, did the Legislature intend to disqualify all strikers, under all circumstances, for benefits under the act, or did it intend to disqualify strikers only when the strike produces a stoppage of production, and therefore lessens the profits of the employer?

In approaching this question it should be kept in mind that the act confers upon the Labor Commissioner authority to appoint a claims deputy, and through him conduct hearings on all pertinent matters related to the reasons and causes for and justifiableness of the un-employment of any claimant under the act except in cases of claims of strikers. The act also provides for a Board of Review appointed by the Governor. All claims of persons, whose unemployment results from labor disputes, must be reviewed and determined by this nonpartisan board. The claim in question in this case was presented to the Board of Review appointed by the Governor and determined by it on the evidence submitted. The Board of Review found that the claimant had been discharged. It made no determination that the claimant was unemployed voluntarily with or without cause, nor did it make any determination of the question of whether or not the strike was justified or unjustified. An appeal to the district court was taken and it was there determined that the claimant was not discharged and that strikers could, under no circumstances, receive benefits under the act.

Under section 4 of the act one is generally qualified if he is unemployed, registers at the unemployment office, and reports in accordance with the regulations prescribed by the commissioner, makes a claim for benefits and is able to and available for work. Unquestionably the claimant in this case was generally qualified under the requirements of section 4. He is, therefore, entitled to benefits unless specifically disqualified for some reason designated by the Legislature.

The controversy presented is confined to the question of specific disqualification under section 5 of the act. Said section purports to set forth the specific disqualifications intended by the Legislature and prescribes the duration thereof. Therein it is provided that an employee shall be disqualified if "he has left work voluntarily without good cause, if so found by the commissioner, . . . " for a period of two to five weeks, to be determined by the commissioner according to the circumstances in the case. (Subdivision a.)

It is also provided that if "he has been discharged for misconduct connected with his employment, if so found

by the commissioner, . . . " he shall be disqualified for a period of two to ten weeks as determined by the commissioner according to the "seriousness of the misconduct." (Subdivision b.)

It is further provided by the act that a claiming employee is barred for benefits if, being totally unemployed,

"(1) He refuses to 'apply for available, suitable work when so directed by the employment office or the commissioner, . . .' "

"(2) He fails to accept available and suitable work offered him by the employment office or other employer.

"(3) He refuses to return to 'his customary self-employment (if any) when so direcetd by the commissioner.' " (Subdivision c.)

It is also provided that:

"No work shall be deemed suitable, and benefits shall not be denied under this act to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

"(a) If the position offered is vacant due directly to strike, lockout or other labor dispute;

"(b) If the wages, hours or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality;

"(c) If as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization." (Subdivision (c) (2) (a, b, c.)

Then follows the disqualifying clause construed by the majority opinion. It provides an individual shall be disqualified for benefits

"For any week in which it is found by the commissioner that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the commissioner that:

"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; . . . " (Subsection d.)

The foregoing provisions of sections 4 and 5, supra, show on their face why I cannot agree with the majority opinion. When the language therein used by the Legislature is given its fair and obvious meaning, the conclusion is inescapable that the expression "stoppage of work" in the quotation from section 5 (d), supra, refers only to stoppage of production at the plant or a distinct unit thereof. The only reasonable construction that can be placed on this subdivision is that the employee claiming compensation under the act cannot recover if there exists a stoppage of production at the plant or factory by reason of a strike in which the claimant is a participant.

The expression "for any week in which it is found by the commissioner that *his* total or partial *unemployment* is *due* to a *stoppage of work* which *exists* because of a labor dispute at the factory" permits of no other construction. The construction placed on this subdivision of section 5 by the majority says, in effect, that the Legislature said the same thing twice in one sentence. If true, this would be an uncommon occurrence, at least. If you strike out of this provision the words "total or partial unemployment is due to a," or if instead you strike out the words "is due to a stoppage of work which," the provision would mean exactly what the majority opinion holds it means as it now appears in the statute. It is obvious to me that the Legislature meant what I think it said, that is, that a claimant under the act cannot recover for total or partial unemployment occasioned by a strike that results in a stoppage of production at the factory unless such claimant was not participating in the strike. The majority opinion says that "stoppage of work" refers to the employee's "stoppage." The provision reconstructed under the interpretation would read "For any week in which it is found by the commissioner that his (the employee's) total or par-

tial *unemployment is due to his stoppage of work which exists* because of a labor dispute at the factory . . . " This demonstrates that the provision is incapable of the construction placed on it by the majority.

The succeeding Legislature, in 1939, recognizing this situation and no doubt having determined on a different policy, had no difficulty in expressing its intention in this regard. It said that an employee would be disqualified "for any week in which it is found by the commissioner that *his* total or partial unemployment is due to a labor dispute at the factory, establishment or other premises at which he is or was last employed; provided, that this subsection shall not apply if it is shown to the satisfaction of the commissioner that: (1) he is not participating in or *financing* or *directly interested in the* labor dispute which caused *his unemployment*." Note here the Legislature left out the expression "stoppage of work," but the word "unemployment" is used in the same connection and with the same application as in the 1936 act. Unquestionably, under the plain import of the language used by the Legislature in the foregoing provision of the 1939 act, an employee could not claim benefits under the act if *his unemployment* is occasioned by his participation in a strike. Whether there was a "stoppage" of production at the plant would make no difference. The interpretation placed on the 1936 act makes this amending section of the 1939 act useless and unnecessary.

Then in 1941 the Legislature again decided to change its policy. It provided disqualification for benefits "for any week with respect to which the commission finds that his unemployment is due to a *stoppage of work which exists at the factory,* establishment or other premises at which he is or was last employed, because of a labor dispute . . ." All the parties herein virtually admit that a striking employee could recover under that act if the employee were not otherwise disqualified and there was no stoppage of production.

There is no appellate court decision construing an act similar to ours that holds in line with the majority opinion. In the West Virginia case cited there was a labor dispute and a shutdown, production was not resumed, and there was no controversy as to whether the expression "stoppage of work" referred to stoppage of production at the factory or the stoppage of work of the employee. Obviously, that case is not an authority in support of the majority view. The West Virginia court was not discussing the question here under discussion when it used the language referred to in the majority opinion.

The question in the West Virginia case was whether or not a labor dispute caused the unemployment and the shutdown. In that case, as here, there was no contention that a labor dispute, resulting in unemployment and shutdown or cessation of production at the plant, would not disqualify those employees participating in the dispute. The West Virginia court held that a disagreement between employees and their employer as to the terms of a labor contract which caused the employees to quit work constituted a labor dispute or strike within the purview of the West Virginia act, which is very similar to ours. The West Virginia court accordingly held that where such a disagreement results in stoppage of employment, a labor dispute exists under the act and the employees participating therein were disqualified, since there was a shutdown or "stoppage of production" at the plant. It is admitted herein that the employee in our case would also be disqualified under the same circumstances. The second paragraph of the syllabus in the West Virginia case will unmistakably demonstrate the correctness of the foregoing differentiation.

In the two Indiana cases cited you have generally the same situation that existed in the West Virginia case. The Indiana statute is very similar to ours in the respect under consideration. There was a shutdown or stoppage of production at the plant. The contention made in the cases was that there was

not a labor dispute and, as in the West Virginia case, the Indiana Supreme Court held that a disagreement between employees and their employer as to the terms of a labor contract, which resulted in unemployment and a shutdown, amounts to a strike or labor dispute within the purview of the act and the participating employees were disqualified. Obviously the problem that we are dealing with in the instant case was not before the Indiana court. There is no discussion in the Indiana opinions on the question of what the expression "stoppage of work" refers to. It was contended therein that the stoppage of work was not due to a labor dispute.

The California case cited arose under an act very similar to our 1939 act. The provision therein construed reads "an individual is not eligible for benefits for unemployment, and no such benefits shall be payable to him under any of the following conditions: (a) If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed." It is obvious that any interpretation of the California court on the foregoing provision of the California act would not be applicable here. By reason of the apparent dissimilarity of the California statute, the problem we have for solution could not arise in California. There is no discussion therein on the question of what the expression "stoppage of work" relates to.

There is no judicial precedent supporting the construction placed on the particular section of our act by the majority. Such construction is contrary to the interpretation of all administrative officers that I have been able to find and contrary to the expressed views of all text writers and authors of law reviews which have come to my attention. The expressions "stoppage of work" and "stoppage of production" used in the disqualification clauses of the various Unemployment Compensation Acts of the states have been universally interpreted to mean a substan-

tial curtailment of work in an establishment, *not the cessation of work by a claimant.*

In view of the fact that the majority opinion is bottomed upon the application of the expression "stoppage of work" to the claimant, and in view of the further fact that there are several instances designated by the act in which an unemployed claimant is specifically justified in voluntarily quitting his job or in refusing to accept work offered, I am at a loss to understand why the author of the opinion makes the statement:

"Whether a person in good health and in possession of his faculties is ever unemployed through no fault of his own has long been a topic of heated debate, but, regardless of the disagreement that invariably arises in such case, one who is out on strike can hardly be said to be unemployed through no fault of his own. Whether his cause is just or unjust is beside the point."

Under the act an unemployed workman is justified in refusing offered work if the wages, hours, and other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality and if the position offered is vacant by reason of strike, lockout, or other dispute, the unemployed person would not be obliged to accept the position. Under the specific terms of the act the unemployed individual would not be required to accept employment if to do so would require that he join a union or resign from a labor organization. Suppose a strike is in progress for the purpose of correcting wages, hours, or other conditions which are admittedly less favorable to the strikers than those prevailing for similar work in the locality. Surely it must be admitted that such a strike would be justifiable, under the spirit of the act, so long as lawfully conducted. Then how could it be said "One who is out on strike can hardly be said to be unemployed through no fault of his own," and "Whether his cause is just or unjust is beside the point?" The conclusion is inescapable that the Legislature thought such a

cause would be just under those circumstances, and it provided that a refusal to accept employment under those conditions would not prohibit a claim for compensation under the act.

Strikes lawfully conducted are generally recognized as lawful methods of exerting economic pressure in ordinary times. (This case arose long before the outbreak of the present war.) At least strikes are not prohibited under our law and it is easy to imagine conditions of labor that would not only justify but demand lawful action on the part of employees to better their working conditions and promote social security among the laboring people.

Unquestionably the Legislature has the power to make striking employees eligible for compensation benefits where there is no shutdown or substantial stoppage of work at the plant. It is not the function of the courts to determine the policy the Legislature should follow in this regard. Its function is to determine what policy the Legislature has established. As long as strikes are lawful and conducted in a lawful manner, it must not be assumed that lawfully conducted strikes are for other than the meritorious purpose of relieving burdensome and unjust laboring conditions and for the ultimate purpose of bettering the social and economic conditions of the laboring people. The whole Unemployment Compensation Act was, no doubt, devised for the general purpose of preventing insecurity among this large class of people.

Assuming for the sake of argument that the provision construed is ambiguous and it is necessary to determine the intention of the Legislature, I am forced to the conclusion that the Legislature did not intend that striking employees should be disqualified unless their unemployment caused a material reduction in production at the plant where last employed. In attempting to solve this problem we should first take into consideration the general economic condition maintaining at the time the act was passed by the Legislature in 1936. Unemployment legislation was in

process of enactment and development all over the country. Security against unemployment was a vital problem. The legislative history of the development of our Unemployment Compensation Act to the present date should be given proper consideration in determining this question. As hereinbefore indicated, the act authorizes and makes it the duty of the commissioner to make investigations and determine the facts in each case and the act invests the commissioner and Board of Review with broad discretion in determining claims arising. It is specifically provided in the act that one who voluntarily quits his employment without cause, if so determined by the commissioner, may be disqualified for only a very limited period of time; that one who is discharged for misconduct can be disqualified under the act, in the discretion of the commissioner or claims deputy appointed by him, upon investigation and according to the facts disclosed, for only two to ten weeks. The act contemplates that one who registers and reports, as instructed, at the employment office designated, and is able, ready, and willing to accept available and suitable work, is generally qualified, and the act specifically provides that an unemployed individual is justified in refusing to accept employment where the wages and conditions of labor are not up to par in that locality or where his acceptance of employment would require him to be a strike breaker, join or resign from a union, or refrain from joining a bona fide labor organization. The act vests authority in the Labor Commissioner and the employment office, in the exercise of their discretion, to direct an unemployed individual to seek employment elsewhere or to accept a designated job or to return to his former employment, and the act provides in this connection that refusal to do as directed in these respects shall bar his right to benefits.

Does it appear reasonable that the Legislature intended that one on lawful strike, whose unemployment has not produced a material decrease in the production of his employer, should be

disqualified for benefits in the face of the foregoing provisions? Is it reasonable to say that the Legislature intended that one discharged for misconduct should be disqualified for only two to ten weeks while one striking for better working conditions should be forever barred? One who voluntarily goes on a strike is certainly no worse than one who voluntarily quits without good cause, but the majority view, in effect, says that the Legislature intended that one striking for good cause but who produces no material change in production is unjustified and not entitled to the benefits of the act. It says that a striking employee is at fault and forever barred in spite of the fact that one discharged for misconduct is only at fault to the extent that he is slightly disqualified. Misconduct can never be justified and one unemployed because of his discharge, occasioned by his misconduct, unquestionably is at fault, and one who quits work without cause is certainly voluntarily unemployed.

The Legislature intended that it be determined by the nonpartisan Board of Review whether or not one on strike is voluntarily unemployed for good cause and therefore justified and not· disqualified at all. The Commissioner of Labor, under the act, may determine that one who is discharged for misconduct should not be disqualified for even the short maximum of ten weeks. Why then should we think that the Legislature intended that one who has a lawful right to strike and is not guilty of misconduct if he acts lawfully in his striking activities should be barred without regard to the justifiableness of the strike?

There is still another very distinct and positive reason why I cannot agree with the majority opinion in this case. The company wrote the employee, as disclosed by the record and majority opinion, notifying him that it was convinced, by evidence in its possession, that he was guilty of having committed unlawful acts. Without reservation it stated to him: "You are hereby discharged, for cause, as an employee of the Mid-Continent Petroleum Corpora-

tion." In compliance with the trade agreement existing between the company and the employees's union, the discharged employee was told that he might interview his department head or superintendent and suggested to him that "We will be glad to rectify any error which we might have made." The trade agreement provides that an employee guilty of misconduct may be discharged; it also provides for an opportunity on the part of the employee, if he so desires, to present his side of the case in an effort to convince the employer that his discharge was not justified. Of course, such privilege was provided for the benefit of the employee. Naturally, if he does not care to exercise the privilege, he may forego it and accept the discharge as intended by the company as a complete severance of the relationship of employer and employee.

The letter of discharge in this case, as the simple, direct, and positive language used by the company indicates, was without reservation or condition. The indication or intimation therein that the employee might be reinstated upon proper showing cannot be construed as making the discharge conditional. However this may be, a direct promise of reinstatement, upon proper showing to be made by the discharged employee, would effectuate the discharge of the employee if the privilege accorded were not exercised. The company intended to sever the relationship of employer and employee at least until a satisfactory showing should be made by the employee and reemployment effected by the employer; so, assuming for the sake of argument (which cannot be reasonably done in this case) that the discharge was conditional, the privilege extended to make a showing and bring about reinstatement was not exercised and the intention of the company to completely discharge the employee in question was effectuated. Certainly it is in no position to contend otherwise. The claimant employee filed his claim for compensation on the ground that he was discharged and he testified that he accepted the letter as

a discharge. From the date of his discharge *he* should be considered, under the provision of the act hereinbefore referred to, as a discharged employee; if it should be determined that he voluntarily left his employmnt for good cause, he should suffer no disqualification; if it should be determined that he left his employment without good cause or by reason of misconduct and discharge, he should be disqualified in conformity with the act according to a proper determination of the seriousness of the offense.

For all of the foregoing reasons, I am obliged to respectfully dissent.