MORRIS GERBER, PAUL HOFFMAN, JOHN MADDEN, JOHN MALINCHAK, JOHN O'NEILL AND H. HOWARD SCHUCHMAN, APPELLANTS-APPELLANTS, v. BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY, THE FEDERATED METALS DIVISION OF AMERICAN SMELTING AND REFINING COMPANY AND THE ATTORNEY GENERAL OF NEW JERSEY, RESPONDENTS-RESPONDENTS.

Argued January 16, 1956—Decided February 13, 1956.

562

*Mr. Abraham L. Friedman* argued the cause for the appellant (*Messrs. Rothbard, Harris & Oxfeld,* attorneys).

*Mr. Clarence F. McGovern* argued the cause for the respondent Board of Review, Division of Employment Security.

*Mr. Maurice Schapira* argued the cause for the respondent Federated Metals Division of the American Smelting and Refining Company.

The opinion of the court was delivered by

OLIPHANT, J. This is an appeal from a judgment of the Superior Court, Appellate Division, which affirmed a decision of the Board of Review of the Division of Employment Security which denied the six claimants unemployment compensation and disability benefits for the period of December 2, 1953 through February 1, 1954. The Appellate Division modified the decision below to the extent that the Board of Review denied temporary disability benefits to the claimant Hoffman and allowed such benefits for one week for a period of illness after the labor dispute and the work stoppage ended.

We granted certification under *R. R.* 1:10–1(*d*)(*e*).

The claimants were employed as watchmen at the plant of the respondent Federated Metals Division of American Smelting and Refining Company. They were members of a labor union recognized by the employer which had a collective bargaining contract with the employer covering the terms and conditions of employment for all production and maintenance employees and watchmen at the plant.

On June 30, 1953 the existing labor contract between the employer and the union expired and the union and employer entered into negotiations for a new contract. The parties were unable to come to an agreement, with the result that on July 29, 1953 the union called a strike which brought about a complete stoppage of production. There is no dispute that the terms and conditions of employment of the watchmen were involved in these negotiations.

After the strike started the claimant-watchmen continued their work pursuant to the provisions of the expired contract. The particular provision referring to the watchmen provided as follows:

"(g) That watchmen at no time engage in any strike, mass-quit, work-stoppage, slow-down, sit-down, picketing or any other conduct which may, in any way, interrupt or interfere with production at the plant and that they will at all times fulfill and discharge their duties without regard to any strike, mass-quit, work-stoppage, slow-down, sit-down, picketing or any other interruption of or interference with production at the Plant."

The six claimants continued to perform their duties until December 2 or 3, 1953, when each received a telegram from the employer stating "Shutting down plant completely due to strike and have no further need of your services." Further, each one was given a notification of separation from the payroll effective December 3, 1953, at 11:30 P. M. The employer then assigned foremen who are part of the supervisory personnel to perform the watchmen's duties. All six watchmen filed their claims for unemployment compensation benefits on December 4, 1953, immediately after they had been let out of work. Several made attempts to get other work but the claimant Hoffman became ill on January 2, 1954, was hos-

pitalized until February 4, 1954, and finally returned to work on February 8, 1954.

In the meanwhile, as a result of negotiations a new contract was effected and the plant was reopened and operation resumed on February 1, 1954.

The Board of Review after a hearing held that the claimants were disqualified for unemployment compensation benefits from December 2, 1953 to February 1, 1954, by reason of the provisions of *N. J. S. A.* 43:21–5(*d*), which provides that an individual shall be disqualified under the following circumstances:

"(d) For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; *provided,* that this subsection shall not apply if it is shown that:

(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case in which (1) or (2) above applies separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises."

The Appellate Division held (1) there was a labor dispute; (2) that the labor dispute resulted in a stoppage of work; (3) that that stoppage in turn inevitably resulted in the unemployment of all production workers and, eventually, the watchmen; and (4) that the watchmen were members of the union which called the strike and had permitted the union to act for them as their bargaining agent, and the terms and conditions of their employment were part of the contract negotiations going on during the strike and they could reasonably expect to reap benefits, if any, from its success, and concluded as members of the union they were directly interested and involved in a labor dispute. Their

reasoning was in accord with the decision in *Ablondi v. Board of Review*, 8 *N. J. Super.* 71 (*App. Div.* 1950).

We are generally in accord with the conclusions reached below, and likewise agree for the reasons stated there that the cases of *Kieckhefer Container Co. v. Unemployment, &c. Comm.*, 125 *N. J. L.* 52 (*Sup. Ct.* 1940), *Id.*, 125 *N. J. L.* 55 (*Sup. Ct.* 1940), and *Great A. & P. Tea Co. v. N. J. Dept. of Labor, etc.*, 29 *N. J. Super.* 26 (*App. Div.* 1953), are distinguishable. *Gerber v. Board of Review, etc.*, 36 *N. J. Super.* 322 (*App. Div.* 1955).

 We cannot concern ourselves either with the wisdom or the limitations expressly set forth in the disqualifications specifically defined in *N. J. S. A.* 43:21-5(*d*). Specific conditions under which unemployment compensation can or should be paid where there is a work stoppage as a result of a labor dispute is clearly within the legislative province. This particular section deals with a sensitive area of policy on which there can be a reasonable difference of opinion, and our province is merely to interpret and apply it to particular situations as they are presented, keeping in mind the general policy of the act.

We are not permitted by construction to lessen or broaden the scope of a statute when the intention of the Legislature in a particular instance is clearly and plainly expressed. *Carlo v. Okonite-Callender Cable Co.*, 3 *N. J.* 253 (1949); *Blackman v. Iles*, 4 *N. J.* 82 (1950); *Hoffman v. Hock*, 8 *N. J.* 397 (1952). We must construe the statute as written. *Grogan v. DeSapio*, 11 *N. J.* 308 (1953); *Ablondi v. Board of Review, supra*.

The appellants argue that even assuming that the unemployment of the claimants was due to a stoppage of work because of a labor dispute nevertheless the claimants are exempted from the disqualification by the escape clauses. *N. J. S. A.* 43:21-5(*d*)(1) and (2). They argue the correct rule is that the disqualification is limited to those employees who demonstrate their interest in the furtherance of a labor dispute by participation and activity therein, and that it was error to refuse to apply that principle in the light of the uncontra-

dicted fact that all the claimants continued to work from the commencement of the strike on July 29, 1953 until the employer discharged them on December 2 or 3, 1953, almost six months later.

These disqualification provisions of our statute had their genesis in and are similar to provisions in the Social Security Act, 42 *U. S. C. A.* § 301 *et seq.*, and as pointed out both in *Ablondi v. Board of Review, supra*, and by the Appellate Division in this case below, our Legislature has refused to pass amendments enlarging or delimiting the restrictions presently in the statute.

Some states appear to qualify the intent of the statute and make disqualification from benefits operative only if unemployment "is directly *due*" to a labor dispute. Our statute, on the other hand, provides that no benefits shall be paid when "unemployment is due to a stoppage of work which exists because of a labor dispute." It is conceded in this case that the watchmen were not participating in or financing the strike, and thus the question to be resolved is whether in the language of the statute they were "directly *interested* in the dispute."

█ The collective bargaining agreement covering all the employees represented by the union includes the watchmen both generally and specifically. In the contract negotiations they stood to gain if a favorable result was obtained by the union in negotiating for all the employees; thus the character of their interest remains directly as a subject matter of the negotiations until the labor dispute ceased to be a dispute and a new contract was entered into. The union as the bargaining agent had the power to negotiate with the respondent-employer for the benefit of every employee, including the watchmen, and to use such economic pressures for the benefit of the entire group as are inherent in and usual in such a situation. When a labor dispute which concerns a part of all of the employees causes, as a direct result, a stoppage of work, then the statute says that every employee thereby put out of employment is directly interested unless he belongs to a grade

or class of workers other than those directly interested in the dispute.

■ The words "grade or class" in the context of *N. J. S. A.* 43:21–5(*d*) obviously was intended to mean and include something more or different than the group of employees directly interested in the dispute, otherwise it would seem to be surplusage.

■ In order to relieve an employee from disqualification under the statute two conditions must be satisfied: (1) that he is not directly interested in the labor dispute; (2) that he belongs to a grade or class of workers separate and distinct from those interested in the labor dispute. Where, as here, a single union represents all the employees and these employees voluntarily make the union their bargaining agent, such agreement for the purposes of this statute excludes a division of classes smaller than the category covered by the contract. The one union represented them as to the terms and conditions of their employment and the labor dispute was the result of a disagreement over such terms and conditions of employment, and there is nothing in the statute that indicates that it was intended to exclude some members of the union simply because the contract dealt with their employment on a different basis as to rates of pay, hours or working conditions. The statute clearly indicates that all employees who benefit by the terms and conditions of a union contract are directly interested therein and must be considered in the same grade or class for the purposes of the statute, and this is so whether they participated in or are financing the labor dispute which resulted in a work stoppage.

We concur that the claimants were disqualified from benefits under the express language of the statute with the exception of the claimant Hoffman, and we agree he was entitled to benefits under *N. J. S. A.* 43:21–4(*f*) for the period from February 1 to 7, 1954, inclusive.

The judgment is affirmed without costs.

HEHER, J. (dissenting). *N. J. S. A.* 43:21–5(*d*) provides that an individual shall be disqualified for benefits for any

week with respect to which it is found that his unemployment is due to a "stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed," provided that the section shall not apply if it is shown that "(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * *."

The six claimants were the entire group employed as watchmen or guards at the plant of the Federated Metals Division of the American Smelting and Refining Company, at 150 St. Charles Street in Newark, New Jersey. The employer had a collective bargaining agreement with Local 143 of the International Union, United Automotive, Aircraft and Agricultural Implement Workers of America (UAW-CIO), prescribing the terms and conditions of employment of all induction and maintenance employees and watchmen at the plant, running from July 1, 1952 to June 30, 1953. It was therein expressly provided that the watchmen would "at no time engage in any strike, mass-quit, work stoppage, slow-down, sit-down, picketing or any other conduct which may, in any way, interrupt or interfere with production at the plant," but would "at all times fulfill and discharge their duties without regard to any" such strike, "or any other interruption of or interference with production at the plant."

The claimants all fulfilled their contractual undertaking in this regard. They were night watchmen whose duties "were entirely different from all other persons employed in the plant." They did not participate in the strike beginning on July 29, 1953, but continued their full service as watchmen without interruption until December 2 or 3 ensuing, when they severally received this telegram from the employer: "Shutting down plant completely due to strike and have no

further need of your services"; also a "Notification of Separation from Payroll" stating that the recipient was "Discharged—your employment is terminated" for the reason given in the telegram.

The employer's personnel manager, Wahl, testified that he sent the telegrams to the claimant watchmen, and signed the termination notices. He said they "were actually discharged at that time," and thereafter their duties were performed by "foremen"; that they would be "called back" if the plant reopened, but "At that time it looked like it was permanent."

The rationale of the holding of the Appellate Division, 36 *N. J. Super.* 322 (*App. Div.* 1955), is to be found in this passage of the opinion:

> "Not only did the labor dispute result in a stoppage of work, but the stoppage in turn inevitably resulted in the unemployment of all production workers and, eventually, the watchmen. It is understandable that the employer company retained the watchmen as long as there was hope that the negotiations might result in a new contract and a resumption of work. But when negotiations broke down and production did not resume, the watchmen were let go. The testimony for the company was that the company could not afford to keep the men on the payroll because of the prolonged strike. Their employment was therefore, in the words of the statute 'due to a stoppage of work,' stemming from a labor dipsute. * * * The fact that the company had its foremen take over the watchmen's duties does not change the result. As supervisory personnel the foremen were not involved in the union demands or the strike. They became idle when production stopped, and it was natural and economically practical that the company have them substituted for the watchmen after December 2."

The judgment proceeds on the hypothesis that the layoffs of the watchmen were "directly attributable to the labor dispute" and were but temporary.

But does not this reasoning lose sight of the contractual undertaking of the watchmen not to engage in a strike, work stoppage or slow-down, "picketing or any other conduct" that would "interrupt or interfere with production at the plant," but would at all times fulfill and discharge their duties "without regard to any" strike, or "any other inter-

ruption or interference" with plant production; and that the watchmen fulfilled the undertaking to the letter? There is no contention *contra*. The contract was designed to hold the watchmen to service in the event of a strike, to serve a need that would continue throughout the strike. And were they not told by the employer in clear and indubitable terms that they were "discharged," and the employer-employee relation was at an end? True, the original term of the collective agreement had expired of its own limitation; but there was provision for its automatic renewal "from year to year thereafter." Even on the contrary hypothesis, the nature of the service of necessity remained the same until the watchmen were discharged. There can be no doubt as to that. And it was the production work that came to a stop. Compare *Board of Review v. Mid-Continental Petroleum Corporation*, 193 *Okla.* 36, 141 *P. 2d* 69 (*Sup. Ct.* 1943); *Miners in General Group v. Hix*, 123 *W. Va.* 637, 17 *S. E. 2d* 810 (*Sup. Ct.* 1941). There was no stoppage of the watchmen's work.

Thus, the unemployment of the watchmen was not due to a stoppage of work incident to a labor dispute in the statutory sense; it was due to their replacement by nine foremen whose work had been terminated by the strike, even though the watchmen had bound themselves to remain in service during a strike or work stoppage, and there was no action *contra*; they were discharged; as to them, the employer-employee relation was terminated to provide places for the foremen.

Such being the case, there is no need to consider exceptions (1) and (2) to the rule of *subsection (d)* of the cited *section* 43:21–5. But, on the converse assumption, there was not in the particular circumstances, I would suggest, the disqualification of direct interest contemplated by these statutory exceptions. The employer's personnel manager testified that the six watchmen had "duties entirely different from all other persons employed in the plant." See *Kieckhefer Container Co. v. Unemployment Compensation Commission (In re Bowen)*, 125 *N. J. L.* 52 (*Sup. Ct.* 1940);

same title *(In re Aurich)*, 125 *N. J. L.* 55 *(Sup. Ct.* 1940). I would reverse the judgment.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING and JACOBS—4.

*For reversal*—Justice HEHER—1.