544 P.2d 1161

**ALBUQUERQUE–PHOENIX EXPRESS, INC., Petitioner-Appellant,**

v.

**EMPLOYMENT SECURITY COMMISSION of New Mexico, Respondent-Appellee,**

**and**

**Robert R. Burgess et al., Claimants-Appellees.**

**No. 10247.**

Supreme Court of New Mexico.

Dec. 24, 1975.

Rehearing Denied Jan. 15, 1976.

Pickering & Mahon, Albuquerque, for appellant.

R. Baumgartner, Albuquerque, for Employment Security Commission.

Kool, Kool, Bloomfield & Eaves, Albuquerque, for claimants.

## OPINION

McMANUS, Chief Justice.

This matter was brought in the District Court of Bernalillo County for review upon certiorari of a decision of the Employment Security Commission (Commission) that certain claimants for unemployment compensation benefits, employees of Albuquerque-Phoenix Express, Inc., petitioner-appellant (Company), who were unemployed as a result of a labor dispute were eligible to receive unemployment benefits. This matter was presented to the court upon briefs and oral argument. From a judgment of the district court dismissing the Company's appeal and affirming the judgment of the Commission, the Company appeals to this court.

After receiving the decision of the court adverse to it, the Company, by this appeal requests review of the following points:

1. Claimants were not available for work nor were they actively seeking work as required by § 59-9-4(A)(3), N.M.S.A. 1953 Comp.

2. Claimants were disqualified under § 59-9-5(a), N.M.S.A. 1953 Comp., as they left work voluntarily without good cause.

3. The employees should have been disqualified under § 59-9-5(d), N.M.S.A. 1953 Comp., as there was a "stoppage of work" at the Company's premises.

4. Even if "stoppage of work" is defined as a substantial curtailment of the

employer's business, such a curtailment did occur.

The first issue raised concerns § 59–9–4(A)(3), supra, which provides, in part, as follows:

"A. An unemployed individual shall be eligible to receive benefits with respect to any week *only* if he:

. . . . . . .

"(3) is able to work and is *available for work* and is *actively seeking work*; * * *" (Emphasis added.)

■ The Appeals Tribunal for the Commission and the Commission itself, which adopted the ruling of the Appeals Tribunal, determined that twelve of the seventeen claimants were available for and actively seeking work. On this issue, the finding of the Appeals Tribunal, being representative of each of the twelve claimants, read in relevant part, as follows:

"The claimant was required to register for work with the New Mexico State Employment Service as a prerequisite to filing for unemployment benefits. The claimant also sought work through the union ([Teamsters] Local 492), which maintains an out-of-work list and a hiring hall. During several weeks while filing continued claims, he was successful in obtaining temporary work through the union. During about seven of these weeks, he earned more than his weekly benefit amount ($56.00). The evidence shows that the claimant was available for full-time work had such been offered to him."

The Commission and the court below adopted this finding and we conclude that there was substantial evidence to support such a finding.

■ The employer seeks to have us interpret the availability and active search for work provisions of § 59–9–4(A)(3), supra, as establishing an absolute standard of availability for permanent new work with no limitations or restrictions of any kind, regardless of the circumstances prevailing in particular cases. Applying this standard

to persons whose unemployment results from a labor dispute and holding them unavailable because they will not immediately return to their jobs with the employer with whom they are disputing, or will not sever their employment relationship with that employer and seek permanent new work, would in all cases make such persons ineligible and render the labor dispute disqualification provisions of § 59–9–5(d), N.M.S.A.1953 Comp., totally superfluous. (That section will be discussed in more detail in our consideration of "stoppage of work.")

On the basis of individual interviews with each claimant by Commission personnel, written documents and other reports in each claimant's file, and the record before the Commission's Appeals Tribunal, where all parties were represented, the Commission found that the claimants were available for and actively seeking work as required by § 59–9–4(A)(3), supra. The Commission further found that a number of claimants had obtained temporary intervening work, and that picket line duty was not mandatory and did not interfere with the claimants' search for or acceptance of work.

It seems obvious that the claimants herein were already employed by the Company. They expected only a temporary unemployment period and, therefore, could be available only for temporary intervening work. It would not make much sense for the Commission to demand that they, in fact, quit their job and really join the ranks of the unemployed, or that they abandon their legal rights and economic interest in the labor dispute and return to their jobs with the employer with whom they were disputing on the premise that their dispute was without merit.

In fact, § 59–9–5(c)(2), N.M.S.A.1953 Comp., expressly provides:

"Notwithstanding any other provisions of this act [59–9–1 to 59–9–29], no work shall be deemed suitable and benefits shall not be denied under this act to any otherwise eligible individual for refusing

to accept new work under any of the following conditions: (a) If the position offered is vacant due directly to a strike, lockout, or other labor dispute; * * *."

Another point for review concerns whether or not claimants left work voluntarily without good cause. The Commission held inapplicable, in the case of labor disputes such as we find here, the voluntary leaving provision of § 59–9–5(a), N.M.S.A.1953 Comp., reading:

"An individual shall be disqualified for benefits—

"(a) For the week in which he has left work voluntarily without good cause, if so found by the commission, and for not less than one (1) nor more than thirteen (13) consecutive weeks of unemployment which immediately follow such week (in addition to the waiting period) as determined by the commission according to circumstances in each case, and such individual's total benefit amount shall be reduced in a sum equal to the number of weeks of disqualification multiplied by his weekly benefit amount."

In *Inter-Island Resorts, Ltd. v. Akahane,* 46 Haw. 140, 156–58, 377 P.2d 715, 724–25 (1962), the Supreme Court of Hawaii analyzed a provision in the Hawaii Employment Security Law quite similar to our provision, § 59–9–5(a), supra, in the following way:

"This argument [that claimants unemployed as the result of a labor dispute should be disqualified under the voluntary leaving provisions of the unemployment compensation law] is in direct conflict with the generally accepted interpretation of the voluntary leaving and the labor dispute disqualification provisions of the various state laws. The consensus supports the conclusion that the two disqualification provisions are mutually exclusive and that an individual whose unemployment is due to a 'stoppage of work' which exists because of a 'labor dispute' cannot be said to have 'left his work voluntarily' within the meaning of the voluntary separation provision. *T. R. Miller Mill Co. v. Johns,* 261 Ala. 615, 75 So.2d 675; *Intertown Corp. v. Appeal Board of Mich. Unemployment Comp. Comm.,* supra, 328 Mich. 363, 43 N.W.2d 888; *Little Rock Furniture Mfg. Co. v. Commissioner of Labor,* 227 Ark. 288, 298 S.W.2d 56; *Marathon Electric Mfg. Corp. v. Industrial Comm.,* 269 Wis. 394, 69 N.W.2d 573, 70 N.W.2d 576; *Lesser, Labor Dispute and Unemployment Compensation,* 55 Yale Law Journal 167.

"It is one of the fundamental tenets of the unemployment compensation law that the administering agency remain neutral in the labor dispute and refrain from passing on the merits of the dispute. Courts almost unanimously hold that the merits of a labor dispute are immaterial in determining the existence of the dispute, the rationale being that the unemployment compensation fund should not be used for the purpose of financing a labor dispute any more than it should be withheld for the purpose of enabling an employer to break a strike. *Sakrison v. Pierce,* supra, 66 Ariz. 162, 185 P.2d 528; *In re Steelman,* supra, 219 N.C. 306, 13 S.E.2d 544; *Amory Worsted Mills, Inc. v. Riley,* 96 N.H. 162, 71 A.2d 788; *W. R. Grace & Co. v. California Employment Comm.,* 24 Cal.2d 720, 151 P.2d 215; *Byerly v. Unemployment Comp. Board of Review,* 171 Pa.Super. 303, 90 A.2d 322; *Lawrence Baking Co. v. Michigan Unemployment Comp. Comm.,* supra, 308 Mich. 198, 13 N.W.2d 260; *T. R. Miller Mill Co. v. Johns,* supra, 261 Ala. 615, 75 So.2d 675.

*        *        *        *        *        *

"Moreover, the terms 'leaving work' or 'left his work' as used in unemployment compensation laws refer only to a severance of the employment relation and do not include a temporary interruption in the performance of services. Kempfer, Disqualifications for Voluntary Leaving and Misconduct, 55 Yale Law Journal

147, 154. Absence from the job is not a leaving of work where the worker intends merely a temporary interruption in the employment and not a severance of the employment relation. Such is the case of strikers who have temporarily interrupted their employment because of a labor dispute. Under the prevailing view, they have not been deemed to have terminated the employment relationship and the voluntary leaving disqualification has no application to them. *T. R. Miller Mill Co. v. Johns,* supra, 261 Ala. 615, 75 So.2d 675; *Mark Hopkins, Inc. v. California Employment Comm.,* 24 Cal.2d 744, 151 P.2d 229, 154 A.L.R. 1081; *Knight-Morley Corp. v. Michigan Employment Security Comm.,* 352 Mich. 331, 89 N.W.2d 541; *Marathon Electric Mfg. Corp. v. Industrial Comm.,* supra, 269 Wis. 394, 69 N.W.2d 573, 70 N.W.2d 576."

We fully adopt this reasoning.

The third point upon which appellants rely is that the employees should have been disqualified for unemployment compensation benefits under § 59–9–5(d), N.M.S.A. 1953 Comp., which provides, in part, that:

"An individual shall be disqualified for benefits—* * *

"(d) For any week with respect to which the commission finds that his unemployment is due to a *stoppage of work* which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; Provided, that this subsection shall not apply if it is shown to the satisfaction of the commission that—

"(1) He is not participating in or directly interested in the labor dispute which caused the *stoppage of work*; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the *stoppage,* there were members employed at the premises at which the *stoppage* occurs, any of whom are participating in or directly interested in the dispute; * * *." (Emphasis added.)

The appellants claim that the term "stoppage of work" refers to the individual efforts of the employee, while the appellees argue that "stoppage of work" refers to a cessation or substantial curtailment of the employer's business. We are thus called upon to interpret this term.

■ We are not the first state supreme court to be confronted with this question. All fifty states have adopted unemployment compensation laws, and a majority of them have a provision disqualifying employees from benefits if the "unemployment is due to a stoppage of work which exists because of a labor dispute * * *." Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, 17 U.Chi.L.Rev. 294 (1950); Lewis, The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence, 45 J.Urban L. 319 (1967); Annot., 61 A.L.R.3d 693 (1975). About twenty of the states have interpreted the term "stoppage of work" to mean a cessation or a substantial curtailment of the employer's business, while only one—Oklahoma—has interpreted the term to mean a stoppage of the individual work of the employee. Annot., 61 A.L.R.3d 693 (1975). We agree with the majority of states and conclude that the term "stoppage of work," as it is used in the context of our Unemployment Compensation Act, refers to the employer's business rather than the employee's work.[1]

1. We note the recent case of *Hawaiian Tel. Co. v. State of Hawaii Dept. of L. & I. Rel.,* 405 F.Supp. 275 (D.Hawaii 1975), wherein the Federal District Court of Hawaii declared that the State of Hawaii's interpretation and application of the "stoppage of work" clause in its Unemployment Compensation Act so impermissably alters the relative economic strength of union versus employer in their bargaining relationship as to thereby encroach upon the field preempted by the National Labor Relations Act in violation of the supremacy clause of the U. S. Constitution. We do not find this decision persuasive because it totally overlooks the fact that in order to qualify for unemployment compensation a striker must be available for, and actively seeking work.

The term "stoppage of work" was originally taken from "Draft Bills" prepared by the Committee on Economic Security, which in turn borrowed the phrase from British Unemployment Insurance Acts. Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, supra. Therefore, it is significant to note that:

> "When this country's fifty-one statutes were adopted, the phrase had long since acquired a settled construction from the British Umpires as referring 'not to the cessation of the workman's labour, but to a stoppage of the work carried on in the factory, workshop or other premises at which the workman is employed.' "

Id. at 308.

Were the phrase "stoppage of work" to refer to the employee's work, it would be redundant in the sentence "his unemployment is due to a stoppage of work which exists because of a labor dispute * * *." If the statute read "his unemployment is due to a labor dispute," or "he stopped working because of a labor dispute," then it would be clear that the legislature intended to disqualify from receiving benefits all those employees who stop work because of a labor dispute, no matter how minimal the impact of their stopping is on the employer's operations.

Furthermore, the sentence "He is not participating in or directly interested in the labor dispute which caused the stoppage of work * * *" would be an extremely clumsy way of phrasing the idea, if "stoppage of work" referred to the employee's individual work. In fact, if we interpreted "stoppage of work" in this way, the whole of section (d) would read awkwardly at best. Therefore, a common sense approach to the words in their context leads us to the same conclusion that nearly all other courts have reached—that "stoppage of work" refers to the employer's business.

■ Finally, it must be stressed that our role in this situation is not to usurp the legislative function. As the Supreme Court of Arizona aptly pointed out in *Sak-*
*rison v. Pierce*, 66 Ariz. 162, 165–66, 185 P.2d 528, 530–31 (1947):

> " * * * Much is made in counsels' briefs of policy considerations. For example, on the one hand lies the charge that to allow compensation in such a case as this would be, in effect, to force employers and the state to finance a strike. On the other hand, it is claimed that to deny it would be to deny aid to those who among others, the Act was designed to protect (i. e., those who had participated in a labor dispute and lost —at least to the extent that others now had their jobs and their former employer's operations had been fully resumed). And that finally, a denial of compensation would seriously cripple their unquestioned right to strike. At the outset it should be made clear that this court is not concerned with any questions relative to the merits of the labor controversy itself. Our decision is not and cannot be determined by such factors. Instead it is determined by the choice that the elected legislative representatives of the people of this state have made for us. And whether or not the Act should compensate employees in this position is properly a choice for the legislature. * * * The function of this court, then, is simply to point out which route our legislature has chosen to travel."

■ Having then concluded that "stoppage of work" means a cessation or substantial curtailment of the employer's business, we are next confronted with the question of whether the employer's business was substantially curtailed at any time during the period from July 20, 1970 until November 30, 1970 when these workers went out on strike. What constitutes a substantial curtailment of work or operations at the employing establishment has generally been regarded by the courts as a question dependent upon the facts and circumstances of each case. Annot., 61 A.L. R.3d 693, 705 (1975). We agree.

■ The district court determined that the Commission's findings were supported

by substantial evidence in the record as a whole, and accordingly adopted and entered the following findings of fact, among others, just as they had appeared in the Commission's decision of August 9, 1971:

"7. Members of Teamster's Local No. 492 who struck the employer's place of business comprised about twenty percent of the employer's total work force.

"8. Immediately after commencement of the strike, the employer began hiring replacements for the striking employees and had replaced as many as necessary to continue normal operations within a few days.

"9. With the exception of some impact on the employer's interline freight business, there was no cessation of normal business activity or curtailment of the work force or productivity at the employer's place of business or establishment during the labor dispute."

The appellant challenges findings 8 and 9 and argues that the labor dispute did cause a substantial curtailment of the employer's business, thereby permitting the labor dispute disqualification provision, § 59–9–5(d), supra, to apply to the claimants here involved. In support of this challenge, appellant refers us to two letters from the attorney for the Company sent to the Commission in which certain unsubstantiated and unsupported figures relating to the curtailment of the Company's business are contained.

In contradistinction to these unverified figures we have the sworn testimony of Duncan A. McLeod, president of the Company, from the transcript of the hearings before the Commission on November 16, 1970. On direct examination, he testified as follows:

"Q Wasn't there any cessation of productive activity at your place of business resulting from this strike at any time?

"A No, not necessarily. We got back and it was operating.

"Q Well, when all these men who are employed, who apparently were employed by you prior to July 20th, who left their work, didn't that interfere with your production at all?

"A Oh, we were a little slow for a few days."

Appellant also refers us to certain pages in the supplemental transcript of record, but we have yet to find any evidence there which casts any doubt upon the accuracy of the district court's findings.

In short, the appellant has failed to demonstrate to us that there is any reason to reject the findings of the Commission and the district court with regard to the impact that the labor dispute had on the employer's business. There was substantial evidence to support the district court's findings 7, 8 and 9, and we conclude that the employer's business did not suffer any substantial curtailment when the employees involved here walked off their jobs.

The judgment of the trial court will be affirmed.

It is so ordered.

MONTOYA and SOSA, JJ., concur.

OMAN and STEPHENSON, JJ., dissenting.

STEPHENSON, Justice (dissenting).

I am unable to agree with the construction placed by the majority upon the Labor Dispute Disqualification section of the New Mexico Unemployment Compensation Law. § 59–9–5(d) N.M.S.A.1953. The construction of that statute which I believe to be correct would require a decision for the company without reaching the other issues dealt with by the majority. I will accordingly confine my comments to that issue.

The court below found that the claimants were employees of the company and members of a labor union. Failing to reach a mutually satisfactory collective bargaining agreement with the company on

economic issues, the union and the employees struck the company's place of business. All of the claimants participated in the strike. Union members who struck the company comprised about twenty percent of the company's total work force. However, under the construction I would place upon the cited statute, this fact is irrelevant.

The Commission contends that "stoppage of work," as that term is used in § 59–9–5(d), refers not to the claimant's work, but to a stoppage or curtailment of the employer's operation. The question is one of first impression in this state. The majority has opted for the Commission's interpretation, but in my opinion the phrase refers to a cessation of work by the employees as a result of a labor dispute, viz. a strike.

I would concede that the statute is awkwardly worded. By parsing the sentence in differing ways and substituting words for phrases, proponents of the two contending theories can endlessly argue that the theory which they espouse is the more reasonable, as the parties have done in their briefs. For example, one could point out that in § 59–9–5 the word "work" is used in each subsection. In the earlier ones the word clearly refers to the employee, and it would be anomolous to apply a different meaning to the work in subsection (d). I eschew this argument as the basis for my opinion, although I agree with the reasoning of the majority in *Board of Review v. Mid-Continent Petroleum Corp.*, 193 Okla. 36, 141 P.2d 69 (1943). I do not think the statute, however inartfully worded, is that opaque.

I premise my opinion on rather simple and well-settled rules of statutory construction and grammar. This court in its opinion in *In re Goldsworthy's Estate*, 45 N.M. 406, 115 P.2d 627 (1941), quoting from Sutherland on Statutory Construction § 408 (2 ed. 1904), said:

"Statutes as well as other writings are to be read and understood primarily according to their grammatical sense, unless it is apparent that the author intended something different. In other words, it is presumed that the writer intended to be understood according to the grammatical purport of the language he has employed to express his meaning."

The court then proceeded to define the doctrine of the last antecedent by quoting from 59 C.J. Statutes § 583 (1932) as follows:

"By what is known as the doctrine of the 'last antecedent,' relative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote."

See also *Hughes v. Samedan Oil Corporation*, 166 F.2d 871 (10th Cir. 1948). Applying these rules to the statute before us, we observe that a "labor dispute" and not a "stoppage of work" must exist at the factory, establishment or other premises.

I agree with the reasoning of the special concurring opinion of Justice Davison in *Board of Review v. Mid-Continent Petroleum Corp.*, supra. Justice Davison stated the definition of the last antecedent rule, quoting from a prior Oklahoma case, to be:

"A limiting clause in a statute is generally to be restrained to the last antecedent, unless the subject-matter requires a different construction."

Certainly there is nothing about the subject matter here which requires a different construction. He then continued:

The last antecedent in the statute before us is the "labor dispute," not the "stoppage of work".

A labor dispute may exist at the factory without a "shutdown". Of course, if a labor dispute does result in a shutdown or stoppage of operations at the plant or factory it may result in a stoppage of

work for individuals not involved in the labor dispute. Individuals not so involved are the subject of consideration by the legislature in the statutory provisions immediately succeeding the above-quoted language.

It is thus my opinion that the thing which must exist at the factory is, under the terms of the statute, the labor dispute, not the stoppage of work; that when the labor dispute exists at the factory resulting in a stoppage of work by the individual he is disqualified to receive benefits if he is a participant in the labor dispute and not working by reason of his own voluntary desire, regardless of whether the factory stops or does not stop operating.

My opinion is bolstered by other considerations, though I reach the above conclusion without their aid. I note the statement of policy which the Legislature included in the Act in § 59–9–2 N.M.S.A. 1953.[1] I cannot read the phrase "through no fault of their own" as meaning or implying evil or wrongdoing or that an employee's work stoppage was subject to censure. *Board of Review v. Mid-Continent Petroleum Corp.,* supra. In ordinary parlance it would mean unemployment due to the employee's own volition or at his decision or election. Considering the phrase in § 59–9–2 in that light, it is clear to me that the very purpose of the Act is to provide compensation for those who are invol-

untarily unemployed. That certainly does not include strikers.

As the majority has pointed out, the conclusion that they have reached is supported by a majority of cases which have passed upon the issue. Most of these cases trace their way back to *Lawrence Baking Co. v. Michigan Unemployment C. Com'n,* 308 Mich. 198, 13 N.W.2d 260 (1944). That case appears to rely heavily on the English National Insurance Act of 1911 and on cases construing it. Bearing in mind that we are now in the year 1976 and that the issue presented is one of first impression in New Mexico, no reason has been suggested to me as to why we should now adopt a construction placed upon a statute of a foreign country by authorities charged with its administration not long after the turn of the century. In fact I am not at all sure why the Michigan court in *Lawrence Banking Co.* even addressed the problem which confronts us. The claimants there were not at any material time unemployed because of a labor dispute so far as I can determine from the opinion. To the contrary, they were unemployed because they had been discharged and replaced by others. The strike for all practical purposes, only lasted about fifteen minutes. I further observe that two strong dissents were filed in *Lawrence Banking Co.* with which I generally agree.

Much is said in the briefs about whether or not a governmental policy of neutral-

1. Declaration of state public policy. As a guide to interpretation and application of this act [59–9–1 to 59–9–29], the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. *Involuntary unemployment* is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by en-

couraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state requires the enactment of this measure, for the compulsory *setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own".* (emphasis added)

ity exists in relation to strikes, a subject touched upon by the majority in its discussion of *Sakrison v. Pierce,* 66 Ariz. 162, 185 P.2d 528 (1947). Since I do not predicate my opinion upon the existence or non-existence of such a policy, I express no opinion as to its existence. I will content myself with saying that if it does not exist, it should.

Still bearing in mind that we are confronted with an issue of first impression and that we are free to adopt an interpretation of the statute which now best suits our situation, I find it interesting that in more modern times several states have refused to adopt "stoppage of work" language, or have eliminated that language after state courts have allowed unemployment compensation to be paid to strikers. In New York and California "stoppage of work" language is absent and strikers are generally ineligible for benefits. For example, see Cal.Unep.Ins. § 1262 (West 1972); N.Y. Labor Law § 592 (McKinney 1965) (seven week waiting period); Colo. Rev.Stat.Ann. § 8–73–109 (1974). There are about fifteen such states. The Texas statute reads "claimant's work stoppage." Vernon's Tex.Stat. art. 5221b–3 (1971). Two cases decided in the 1950's in Arizona held that stoppage of work referred to the employer's business. *Sakrison v. Pierce,* supra; *Mountain States Tel. & Tel. Co. v. Sakrison,* 71 Ariz. 219, 225 P.2d 707 (1950). Soon thereafter in 1952 the Arizona Legislature deleted "stoppage of work" and disqualified those employees involved in a labor dispute. Ariz.Rev.Stat. Ann. § 23–777 (1971). Michigan also changed its statute after the courts interpreted stoppage of work as the employer's operation. *Lawrence Banking Co. v. Michigan Unemployment C. Com'n,* supra, and Mich.Comp. Laws Ann. § 421.29 (1967).

For the reasons stated, I respectfully dissent.

OMAN, J., concurs.