TWENTY–EIGHT (28) MEMBERS OF OIL, CHEMICAL AND ATOMIC WORKERS UNION, LOCAL # 1–1978, Appellants,

v.

EMPLOYMENT SECURITY DIVISION OF ALASKA DEPARTMENT OF LABOR, and Chevron U.S.A., Inc., Appellees.

No. 6126.

Supreme Court of Alaska.

Feb. 18, 1983.

---

Randall Simpson, Jermain, Dunnagan & Owens, Anchorage, for appellants.

Bruce M. Botelho, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellee Employment Sec. Div.

Stephen M. Ellis and Marc D. Bond, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage for appellee Chevron U.S.A., Inc.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

CONNOR, Justice.

### I. FACTS

This case involves an appeal from a superior court judgment affirming the decision of the Employment Security Division of the Alaska Department of Labor [hereafter "ESD"] to disqualify striking Chevron employees from receiving unemployment compensation benefits. At issue is the construction of AS 23.20.380(9) which denies benefits to insured workers if "unemployment is due to a stoppage of work because of a labor dispute...."

The basic facts are not in dispute. Chevron U.S.A., Inc. [hereafter "Chevron"] has a marketing division which maintains and operates three facilities in the Anchorage area: a terminal dock facility, an airport facility, and a management facility in the Kenai Building on "C" Street. The 28 Chevron marketing employees involved in this case, including terminal operators, product delivery drivers, aircraft refuelers and maintenance mechanics, were represented by the Petroleum Workers Union of America prior to a de-certification election in May, 1979. Thereafter, and for the remainder of 1979, the employees sought to bargain with Chevron through their representative the Oil, Chemical and Atomic Workers Union, Local # 1–1978 [hereafter "OCAW"]. Failure of these negotiations resulted in a strike by OCAW against Chevron in 9 western states, including Alaska and Hawaii. In Alaska the strike began at 6:00 a.m. on January 14, 1980. Pickets were initially established at all three of the Anchorage Chevron facilities, and continued at least sporadically at the dock and airport facilities.

Anticipating the strike, Chevron had secured some replacement personnel and had trained them on-the-job at the airport prior to January 14, 1980. Chevron also brought in approximately 18 of its employees from outside of Alaska, reassigned some 10–12 employees, and hired additional local personnel and private contractors to take over the work of the strikers. Despite some initial delay, changes in operations and additional costs, Chevron was able to make all of its deliveries and continued to meet its customers' demands.

The striking employees applied to ESD for unemployment benefits pursuant to the Employment Security Act, AS 23.20.005–.535. In a decision entered on March 4, 1980, the Assistant Director of ESD denied benefits indefinitely beginning January 13, 1980. The basis of the decision was that under AS 23.20.380(9), "a work stoppage had occurred at the employer's premises because of a labor dispute, and that the said OCAW members were directly interested in the dispute that caused the work stoppage."

Twenty-eight (28) members of OCAW individually appealed to the Commissioner of Labor from this determination. The appeal was considered by the Alaska Labor Commissioner as a joint appeal of all 28 members of OCAW because the legal issues involved in the appeal were the same for each. By agreement and stipulation of the parties, the only issue before the Labor Commissioner was whether there was a "stoppage of work" within the meaning and intent of AS 23.20.380(9). The appeal hearing was held before a Referee for the Department of Labor in Anchorage on April 23, 1980. In his decision, the Commissioner of Labor overruled his prior interpretations of this labor dispute disqualification statute and held that the "stoppage of work" language of the statute referred to any cessation of work by the individual employee and not to cessation of the business activities of the employer. Therefore, the determina-

tion of the Employment Security Division, that OCAW members were disqualified from unemployment benefits during the entire period they were on strike, was sustained.

An appeal of the Labor Commissioner's decision was filed in the superior court on September 5, 1980. Judge Victor Carlson, on May 11, 1981, affirmed the Commissioner of Labor's interpretation of the "stoppage of work" language in AS 23.20.380(9) and his decision denying the OCAW members unemployment benefits for the period in which they were on strike. This appeal followed.

## II. WHETHER THE PHRASE "STOPPAGE OF WORK" IN AS 23.20.380(9) REFERS TO THE OPERATIONS OF THE EMPLOYER OR THE INDIVIDUAL EMPLOYEE.

■ The Alaska Employment Security Act, AS 23.20.005–.535, establishes a comprehensive program which provides unemployed workers with job placement services and cash benefits during their period of unemployment. Section 23.20.380 provides certain instances and situations in which otherwise eligible employees are disqualified from receiving benefits. The sub-section at issue in this appeal reads as follows:

"Sec. 23.20.380. *Disqualification for benefits.* An insured worker is disqualified for waiting-week credit or benefits for a week of his unemployment if with respect to the week the department finds that ...

.(9) during the week unemployment is due to a stoppage of work because of a labor dispute at the immediate factory, establishment, or other premises at which he is or was last employed; for the purposes of this section, each separate department of

the same premises which is commonly conducted as a separate business in separate premises is considered a separate factory, establishment or other premises; this subsection does not apply if the department finds that

(A) he was not participating in or directly interested in the labor dispute which caused the stoppage of work, and

(B) he did not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurred any of whom were participating in or directly interested in the dispute; or

(C) the labor dispute is caused by the failure or refusal of an employer to conform to the provisions of an agreement or contract between employer and the employee, or a law of the state or of the United States pertaining to hours, wages or other conditions of work, ..."[1]

Appellant members of OCAW claim that the term "stoppage of work" refers to the cessation or substantial curtailment of the employer's business. Prior to this case, the Alaska Commissioner of Labor had consistently interpreted that phrase in this way, thereby providing striking workers with unemployment benefits so long as the employer's business activities were not substantially curtailed. Prior hearings focused on whether the employer's business activity had been so substantially curtailed as to constitute a stoppage of work.

Appellees, ESD and Chevron, claim that the term "stoppage of work" refers to the labor of the individual employee, and therefore disqualifies anyone from receiving unemployment benefits who has individually stopped work because of a labor dispute. Both sides agree that courts in other states

---

1. Effective October 1, 1980, this section was repealed by Ch. 9, § 80, SLA 1980, and replaced with:

"Sec. 23.20.383. *Labor dispute disqualification.* (a) An insured worker is disqualified for waiting-week credit or benefits for a week of his unemployment if, for that week, the department finds his unemployment is due to a stoppage of work caused by a labor

dispute at the immediate establishment or other premises at which he is or was last employed. . . ."

The substance of the section, including the stoppage of work clause, remains essentially the same. The legislature saw fit to establish this as a separate section and added the word "his" before unemployment.

which have had to construe the phrase "stoppage of work" in the context of unemployment compensation have almost unanimously agreed that the phrase refers to the employer's operations rather than to the individual efforts of a particular claimant. Indeed, this interpretation was termed the "American Rule" by the U.S. Supreme Court. *New York Telephone Co. v. New York State Labor Department,* 440 U.S. 519, 534, 99 S.Ct. 1328, 1338 n. 24, 59 L.Ed.2d 553, 565 n. 24 (1979).[2] ESD and Chevron contend, and the superior court agreed, that this interpretation has little to recommend it other than tradition.

As the construction of the phrase "stoppage of work" is a question of law wherein no agency expertise is required for interpretation, the standard of review is the "substitution of judgment test." *Jager v. State,* 537 P.2d 1100, 1107 n. 23 (Alaska 1975). In order to properly construe AS 23.20.380(9) we have investigated, and herein evaluate, the reasons underlying the majority and minority interpretations of equivalent statutes in other states.

A. The Statute On Its Face.

As ESD points out, "the language of Alaska's statute is not the most artfully phrased." Nor is the phrase "stoppage of work" defined anywhere in the Employment Security Act. A basic principle of statutory construction is that all language in a statute should be given some meaning. *Isakson v. Rickey,* 550 P.2d 359, 364 (Alaska 1976). OCAW members contend that the phrase "stoppage of work" would be devoid

of meaning unless it referred to a stoppage of the plant's operations since the individual work stoppage of the employee is already referred to by the word "unemployment". The majority of courts have relied on this reasoning in construing "stoppage of work," calling it a "logical" and "common sense" reading:

> "If the phrase 'stoppage of work' were to be given the [minority] interpretation ..., it would be both a redundant and clumsy way to express the idea.... If the statute instead read simply 'his unemployment is due to a labor dispute,' we would not hesitate to agree ... that the legislature intended to disqualify from receiving benefits those employees who stop work because of a labor dispute. The legislature, however, has added a requirement that there be a 'stoppage of work.' This added requirement would be meaningless unless it referred to work stoppage at the plant; ..."

*Continental Oil Co. v. Board of Labor Appeals,* 178 Mont. 143, 582 P.2d 1236, 1240 (Mont.1978). *See also, Monsanto Chemical Co. v. Thornbrough,* 229 Ark. 362, 314 S.W.2d 493, 495 (Ark.1958); *Inter-Island Resorts, Ltd. v. Akahane,* 46 Hawaii 140, 377 P.2d 715, 720 (Hawaii 1962); *Albuquerque-Phoenix Express, Inc. v. Employment Security Commission,* 88 N.M. 596, 544 P.2d 1161, 1166 (N.M.1975). We agree that to interpret "stoppage of work" as cessation of work by the individual employee would make it synonymous with "unemployment."[3] We hold that the phrase "stop-

---

**2.** A review of the Annotation, *Construction of Phrase "Stoppage of Work" in Statutory Provision Denying Unemployment Compensation Benefits During Stoppage Resulting from Labor Dispute,* 61 A.L.R.3d 693 (1975), reveals that most courts which have interpreted this language have held that it refers to the work of the employer, not the employee. Oklahoma apparently remains the only state whose highest court holds to the contrary. *Board of Review v. Mid-Continent Petroleum Corporation,* 193 Okl. 36, 141 P.2d 69 (Okl.1943). Since 1975, the highest courts of three more states have followed the majority rule under this statutory language allowed strikers to collect unemployment benefits so long as their activities have not substantially curtailed the produc-

tive operations of their employer. *See Continental Oil Co. v. Board of Labor Appeals,* 178 Mont. 143, 582 P.2d 1236 (Mont.1978); *Albuquerque-Phoenix Express, Inc. v. Employment Security Commission,* 88 N.M. 596, 544 P.2d 1161 (N.M.1975); *Shell Oil Co. v. Brooks,* 88 Wash.2d 909, 567 P.2d 1132 (Wash.1977).

**3.** The ESD claims that this is merely an "imprecision" in the wording of the statute, not a redundancy, and it stems from the fact that the statute is intended to cover a variety of situations. This explanation does little to give meaning to the phrase or its insertion in the statute.

page of work" in AS 23.20.380(9) refers to the employer's operation.[4]

### B. Historical Analysis

All 50 states have adopted unemployment compensation laws as a part of the federal-state unemployment insurance system established under the Social Security Act of 1935. Each of these statutes has fashioned some type of "labor dispute disqualification" to bar benefits to unemployed workers if their unemployment is caused by a labor dispute. W. Lewis, *The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence,* 45 J.Urb.L. 319, 320 (1967). There are two basic versions of this disqualification. First, there is the "labor dispute in active progress" concept. As commonly phrased, this disqualification provision reads:

> "An individual is disqualified for benefits for any week with respect to which the commission finds that his unemployment is due to a labor dispute which is in active progress at the factory, establishment, or other premises at which he is or was last employed...."

Lewis, *supra,* at 321–22. Under this statute, any individual unemployment caused by a labor dispute in active progress results in denial of benefits.

However, the majority of the states adopted the second concept, the "stoppage of work" phraseology currently in use in Alaska, following the example of the Model Federal Draft Bill.[5] The Model Federal Bill was in turn patterned after the language of the trade dispute disqualification of the British National Unemployment Insurance Act of 1935. 25 Geo. 5, ch. 8, § 26(1), *quoted in* W. Lewis, *supra,* at 322.

The majority interpretation of "stoppage of work" is consistent with the construction given by the British courts:

> "When this country's fifty-one statutes were adopted, the phrase had long since acquired a settled construction from the British Umpires as referring 'not to the cessation of the workman's labour, but to a stoppage of the work carried on in the factory, workshop or other premises at which the workman is employed.' "

M. Shadur, *Employment Benefits and the "Labor Dispute" Disqualification,* 17 U.Chi. L.Rev. 294, 308 (1950).

When interpreting statutes adopted from other jurisdictions, this court generally follows the well established rule that the original jurisdiction's interpretation of a statute be adopted with the statute. *City of Fairbanks v. Schaible,* 375 P.2d 201, 207–08 (Alaska 1962). Under this rule many courts have found the historical interpretation of "stoppage of work" persuasive. *Id.* However, we will not adhere to this rule "if a precedent underlying an adopted statute [is] ... no longer vital or [is] ... poorly reasoned." *Zerbe v. State,* 583 P.2d 845, 847 (Alaska 1978).

---

4. Appellees argue unpersuasively that two rules of statutory construction support the contrary interpretation. (1) Under the doctrine of the last antecedent, which states that a limiting clause in a statute is generally to be restrained to the last antecedent (*see* C. Sands, Sutherland Statutory Construction, § 47.33, at 159 (4th ed. 1973)), the last antecedent is urged to be a "labor dispute" not a "stoppage of work." Therefore, Appellees conclude, the thing which must exist in order to disqualify the employee from unemployment benefits is a labor dispute, not a stoppage of work. (2) Under the doctrine that the same words or phrases are presumed to have the same meaning when used in different parts of a statute (*see Chugach Natives, Inc. v. Doyon, Ltd.,* 588 F.2d 723, 725 (9th Cir.1978)), the word "work" in the statute is urged to mean that of the employee rather than that of the employer. Therefore, Appellees conclude, when used in the phrase "stoppage of work," it must again refer to the work of the employee, not the employer. We find these technical rules of grammatical construction to be unhelpful in ascertaining the legislative intent of this section.

5. The Model Federal Bill provides:
> "An individual shall be disqualified for benefits ...
> (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed...."

Social Security Board, Draft Bills for Unemployment Compensation of the Pooled Fund and Employer Reserve Account Types (1936), *quoted in* W. Lewis, *supra,* at 322.

In 1937, the Alaska Territorial Legislature adopted its first Employment Security Act, which disqualified an individual for benefits if "his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute. . . ." (Ch. 4, § 5(d) ESLA 1937). In 1939, the legislature departed totally from this "stoppage of work" concept and disqualified an individual for 8 weeks if "his total or partial unemployment is due to a labor dispute which is in active progress. . . ." (Ch. 1, § 25 SLA 1939). The United States Supreme Court upheld a denial of benefits under this 1939 law in *Alaska Unemployment Compensation Commission v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136, 145 (1946), finding that the commission could view a labor dispute as "active" even after the point was reached when all possibility of settlement disappeared. In 1941, the legislature removed the "active progress" section to provide for disqualification "for any week . . . unemployment is due to a labor dispute. . . ." (Ch. 40, § 16, SLA 1941). In 1955, the statute was changed again and the "stoppage of work" clause was re-inserted to provide for disqualification "for such week as unemployment was due to a stoppage of work then existing because of a labor dispute." (Ch. 5, § 741 ESLA 1955). The statute and language at issue was codified from the 1955 law and re-enacted as AS 23.20.380(9) in 1962.

The Commissioner of Labor concluded from this history that it was not the legislature's intent to return to the "stoppage of work" concept. He based this conclusion on the fact that these 1955 changes were not acceptable at the regular session and were only passed in an emergency session with "great haste" and with "total concern with more weighty matters." We find this to be unsupported conjecture and speculation.

Indeed, it is much more logical to conclude from the history of successive amendments that the legislature did intend just such a change. The "stoppage of work"

language was re-enacted and re-incorporated into Alaska's labor dispute disqualification provision after numerous state supreme courts had interpreted the phrase, with the "overwhelming majority" adopting the "American Rule." M. Shadur, *supra,* at 308 (1950).

Significant among these decisions is *Lawrence Baking Co. v. Michigan Unemployment Compensation Commission,* 308 Mich. 198, 13 N.W.2d 260 (Mich.1944), *cert. denied,* 323 U.S. 738, 65 S.Ct. 43, 89 L.Ed. 591 (1944). Like the Alaska legislature, Michigan had amended its labor dispute disqualification from the "labor dispute in active progress" language to the "stoppage of work" language. In applying the disqualification to 16 striking bakery workers who had interrupted the company's operation for only 15 minutes before being replaced with new employees, the court took note of this change of statutory language and the interpretations of other courts of this phrase and concluded that the legislature intended to disqualify an employee for benefits only when his unemployment resulted from a stoppage or substantial curtailment of the work and operations of the *employer* establishment.

In the case of Alaska's statute, it is clear that a substantive change was intended because the change in phraseology fundamentally altered the purview of the statute. Although the legislature may have enacted the statute in haste initially, the fact that the "stoppage of work" language has been retained over a twenty-seven year period of amendments and recodifications should dispel any notion that it was the unintended result of hasty enactment. Indeed, the legislature's acquiescence in ESD's formerly consistent interpretation of "stoppage of work" as meaning cessation of employer operations indicates that the legislature intended AS 23.20.380(9) to be interpreted under the majority rule.[6]

---

**6.** Additionally, the most recent amendment of the statute (*see supra* note 1) indicates that if the legislature had wanted to identify an individual's "stoppage of work," it would have inserted the pronoun "his" before "stoppage of work" just as it did when identifying an individual's "unemployment".

## C. Policy

ESD and Chevron urge, and the superior court found, that the minority interpretation is more consistent with the policy of the Employment Security Act as stated in AS 23.20.010.[7] As we recently stated, "[t]he primary purpose of the Alaska Employment Security Act is to ameliorate the negative effects that involuntary unemployment has on both the unemployed individual and society as a whole." *State Department of Labor v. Boucher,* 581 P.2d 660, 662 (Alaska 1978). ESD and Chevron claim that by no stretch of the imagination can a striker's unemployment be characterized as involuntary, as he is free to return to his job at any time. Therefore, a striker's unemployment is not meant to qualify the striker for unemployment benefits.

This reasoning is the bulwark of the minority view. In *Board of Review v. Mid-Continent Petroleum Corp.,* 193 Okl. 36, 141 P.2d 69 (Okl.1943), the court cited with approval the conclusion that "the purpose of the act was to provide benefits to those who *were involuntarily out of employment, and* not to finance those who were willingly and deliberately refusing to work because of a failure of their employers to accede to demands for higher wages." *Id.* at 72. In *Aero Design & Engineering Co. v. Board of Review,* 356 P.2d 344 (Okl.1960), the court ignored the disqualification section of the statute and relied *solely* on a declaration of policy similar to Alaska's (i.e. to assist "persons unemployed through no fault of their own") and concluded that "one who is out on strike can hardly be said to be unemployed through no fault of his own...." *Id.* at 345–46.

There are two rebuttals to this argument. First, the general policy section of AS 23.20.010 does not override the specific enunciation of the labor dispute disqualification in AS 23.20.380(9). Insofar as there is an apparent conflict and it is impossible to give effect to both provisions, the specific provision governs over the general. *State Department of Highways v. Green,* 586 P.2d 595, 602 (Alaska 1978). Subsection (9) specifically states that a labor dispute will disqualify a claimant for benefits only when it results in a "stoppage of work." This particular intent controls over the general intent of ameliorating the negative effects of involuntary unemployment. *See Continental Oil Co. v. Board of Labor Appeals,* 178 Mont. 143, 582 P.2d 1236, 1241 (Mont.1978); *Inter-Island Resorts v. Akahane,* 46 Hawaii 140, 377 P.2d 715, 724 (Hawaii 1962).

Second, conclusion that the voluntary or involuntary status of the unemployment is the *only* criterion for denial or allowance of benefits is incorrect. In Alaska a person may be voluntarily unemployed and still receive benefits if enrolled in a vocational training course, AS 23.20.382. In view of this express exception, it is clear that the voluntary-involuntary distinction is not conclusive. AS 23.20.380(9) is another specific exception to the general policy of compensating involuntary unemployment.

ESD maintains that the majority interpretation of "stoppage of work" forces the state to take sides with the employee in a labor dispute by financially subsidizing his strike, thereby placing the employer "in the ridiculous position of having to finance the strike against him through his direct reim-

---

7. AS 23.20.010 provides:

"*Policy.* As a guide to the interpretation and application of this chapter, the public policy of the state is declared to be as follows: Economic insecurity due to involuntary unemployment is a serious menace to the health, morals and welfare of the people of the state. Involuntary unemployment is, therefore, a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden and to maintain purchasing power as a factor in stabilizing the economy of the state. This can be accomplished by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment, from which benefits may be paid for periods of involuntary unemployment. The legislature, therefore, declares that, in its considered judgment, the public good and the general welfare of the citizens of the state require the enactment of this measure, under the police power of the state, for the operation of public employment service offices and for the establishment of an employment security program to be used for the benefit of eligible unemployed persons."

bursement of the employment insurance fund, or through taxes paid into the fund." The superior court felt that the majority decisions reflect a policy inappropriate to today's parity in labor and management strength. The court similarly concluded that it was "illogical" in that the "unsuccessful" striker is subsidized with benefits while the "successful" striker (one who substantially curtails the employer's operations) is denied benefits.

This statute can be seen as attempting to chart a neutral course between two absolute approaches to the payment of unemployment benefits. If compensation were always paid to striking workers, the state would abolish the labor dispute disqualification entirely and could be viewed as always siding with the striker. If compensation were never paid to strikers (the position urged by Appellees) the state could be viewed as seriously interfering with the right to strike and thus siding with management.

The legislature, by enacting the "stoppage of work" language has avoided these positions, and called upon the ESD to refrain from passing on the merits of the dispute in evaluating benefits claims. Strikers who do not stop the employers' operations qualify for benefits while those who succeed in curtailing production do not. Employers whose operations continue must therefore contribute to the fund while employers whose work is stopped do not. We do not find this scheme to be without some measure of logic.

Additionally, as was stated in *Sakrison v. Pierce,* 66 Ariz. 162, 185 P.2d 528, 530–31 (Ariz.1947):

> "At the outset it should be made clear that this court is not concerned with any questions relative to the merits of the labor controversy itself. Our discussion is not and cannot be determined by such factors. Instead it is determined by the choice that the elected legislative representatives of the people of this state have made for us. And whether or not the Act should compensate employees in this position is properly a choice for the legislature. . . . The function of this court,

then, is simply to point out which route our legislature has chosen to travel." It is not this court's function to determine whether the scheme is out-dated or current, appropriate or inappropriate. We must simply determine what the scheme is.

Therefore, we conclude that the majority interpretation of the phrase "stoppage of work" as referring to the employer's operations and not the work of the individual employee, is the sound interpretation of AS 23.20.380(9). This interpretation, providing strikers with unemployment benefits unless there has been a stoppage of the employer's operations due to the labor dispute, is supported by the language of the statute and its historical evolution. Furthermore, the majority interpretation is at least defensible in terms of policy considerations underlying the provision of unemployment benefits. Accordingly, we reverse the superior court's affirmation of the Labor Commissioner's determination that the phrase "stoppage of work" in AS 23.20.380(9) refers to the work of the employee rather than the operations of the employer. "Stoppage of work" refers to a substantial curtailment of an employer's operations.

III. WHETHER THERE WAS SUCH A "STOPPAGE OF WORK" AS TO DISQUALIFY THE MEMBERS OF OCAW FROM UNEMPLOYMENT BENEFITS UNDER AS 20.23.380(9).

Given the rule that a stoppage of work is to be defined in terms of a halt in operations or production at the employer's establishment rather than an individual's cessation of work, the question remains whether such a "substantial stoppage" occurred so as to satisfy the disqualification provision. W. Lewis, *supra,* at 327 n. 30. The factors determining "substantial stoppage" depend upon the facts and circumstances of each case (*Continental Oil Co. v. Board of Labor Appeals,* 178 Mont. 143, 582 P.2d 1236, 1243 (Mont.1978); *Albuquerque-Phoenix Express, Inc. v. Employment Security Commission,* 88 N.M. 596, 544 P.2d 1161, 1166 (N.M.1975)), and the cases appear to have inconsistent results.

Most decisions follow the general practice of examining decreased production, busi-

ness revenue, service, number of employees, payroll, or man-hours. M. Shadur, *supra,* at 311; Annot., 61 A.L.R.3d, *supra,* at 705–06. Some cases focus primarily on interference with production, denying the payment of benefits only if production is reduced by a significant percentage, usually about twenty to thirty percent. (*See, e.g., Meadowgold Dairies-Hawaii, Ltd. v. Wiig,* 50 Hawaii 225, 437 P.2d 317, 320 (Hawaii 1968)). Other courts eschew reliance on a precise percentage in determining the "stoppage of work." These courts have adopted a more flexible test of "substantial" work stoppage by assessing "the main business of the employer" and determining whether that primary business purpose has been substantially curtailed. (*See, e.g., Westinghouse Broadcasting Co., Inc. v. Director. of Division of Employment Security,* 378 Mass. 51, 389 N.E.2d 410, 413 (Mass.1979); *Continental Oil Co. v. Board of Labor Appeals,* 178 Mont. 143, 582 P.2d 1236, 1244 (Mont.1978)). The third approach, the minority view advocated by the ESD, recognizes as "stoppage of work" any reduction in any business activity of the employer, including research, construction, training, planning, budgeting and methodology.

Since the Labor Commissioner interpreted the phrase "stoppage of work" as referring to the work of the employee and not that of the employer, he did not have to address the question of whether or not there was a substantial curtailment of the employer's operation. Nevertheless, the Commissioner made the following observations:

"Chevron was generally able to meet the demands of its customers in a safe and competent manner. I can not find that the strike resulted in decreased production, business revenue, service, number of employees, payroll, man-hours, or any of the other factors which are normally looked to in gauging whether or not an employer's business activity has been substantially curtailed. I do however find that the following disruptions of Chevron's normal business activities did occur. Only approximately 70% of Chevron's deliveries could be made during the first few days of the strike and, as of the April 23, 1980 hearing, operations had still not reached total efficiency. Virtually no sales, engineering or other tasks normally performed by exempt employees could be performed while the strike was in progress. The refusal of teamsters, longshoremen and U.S. Postal Service employees to cross picket lines placed an extra work burden on Chevron during the course of the strike. Additional expenses of overtime, per diem, employee housing and transportation, contracted services, etc. cost Chevron an additional $22,000 to $37,000 a week to do business."

The Commissioner then reached the following conclusions:

"I need not address the question of whether or not their stoppage resulted in a substantial curtailment of their employer's business activity. However, if I were to do so, I would be of the opinion that their stoppage had exactly that effect. It may not have impacted Chevron's business in the traditional sense (decreased production, business revenue, service, etc.) but it definitely disrupted the normal functioning of Chevron's marketing activities and caused a notable increase in Chevron's cost of doing business."

As the superior court affirmed the Commissioner's construction that the phrase "stoppage of work" referred to the employee's, and not to the employer's operations, it found it unnecessary to determine "the exact degree to which Chevron's operations were disrupted. . . . "

The members of OCAW claim that the traditional factors mentioned by the Commissioner in his decision (decreased production, business revenue, service, number of employees, payroll, man-hours) are the *only* factors which may be considered. They claim that the use of costs is not supported by any case authority, was non-probative, and unjust since they had no opportunity to investigate Chevron's records and accounts and rebut these claims.

While it is true that there is no authority establishing costs alone as determinative, appellants are incorrect in claiming that evidence of costs is totally nonprobative. The costs incurred by Chevron as a result of

the labor dispute are directly related to business revenues, one of the factors traditionally examined in determining "substantial curtailment." Furthermore, changes in production methodology caused by a labor dispute, such as the transfer of work to outside contractors might also be a legitimate factor worthy of consideration in determining whether the "main business" of the employer has been curtailed. *General Electric Co. v. Director of Employment Security,* 349 Mass. 358, 208 N.E.2d 234, 237 (Mass.1965). However, such non-traditional criteria are only persuasive when considered in conjunction with the traditional factors.

 Evidence of increased costs or changes in production methodology is not conclusive evidence of substantial work stoppage. We hold that this evidence is relevant to the issue of "substantiality" only for the purpose of establishing curtailment of the employer's main business purpose. It is not clear from the record that the Labor Commissioner considered the evidence of increased costs in only this limited sense. In fact, from the Commissioner's report it appears that the finding of substantial curtailment was based *solely* upon the findings of (1) increased cost and (2) reduction in activities other than the employer's main business purpose. Therefore, we remand to the superior court with instructions to remand to the ESD for a determination as to whether Chevron suffered a substantial curtailment of its main business operations constituting "stoppage of work" within the meaning of AS 23.20.-380(9).

REVERSED and REMANDED.

RABINOWITZ, Justice, dissenting.

I disagree with the court's construction of AS 23.20.380(9).

In articulating the policies of Alaska's Employment Security Act our legislature provided in part that:

As a guide to the interpretation and application of this chapter, the public policy of the state is declared to be as follows: Economic insecurity due to *involuntary unemployment* is a serious menace to the health, morals and welfare of the people of the state. *Involuntary unemployment* is, therefore, a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden and to maintain purchasing power as a factor in stabilizing the economy of the state. This can be accomplished by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment, from which benefits may be paid for periods of *involuntary unemployment.* (emphasis added).[1]

In his decision in the instant case the Commissioner of Labor concluded the "stoppage of work" clause contained in AS 23.-20.380(9) meant "any cessation of an employee's work." In so ruling the Commissioner reasoned in part:

I am totally unimpressed with arguments to the effect that an individual is "involuntarily unemployed" where he does *not* lose all possibility of employment with the labor dispute employer or with arguments to the effect that benefits should be awarded because a strike has no chance of success. . . . Accordingly, I hold that the word "work" as contained in the clause "stoppage of work" in AS 23.20.380(9), in this case and in all subsequent proceedings involving similar questions, refers to the work of the individual in the same manner that the word "work" is used elsewhere throughout the Alaska Employment Security Act (i.e.— AS 23.20.380(2), AS 23.20.380(4), AS 23.-20.385, etc.) and that to hold otherwise violates the concept of "involuntary unemployment" as contained in the Alaska Legislature's declaration of policy in AS 23.20.010. (emphasis in original).

*Employment Security Division of Alaska Department of Labor v. Twenty-Eight (28) Members of Oil, Chemical and Atomic Workers Union, Local # 1–1978,* No. 80H–60LD, Slip. Op. at 4 (Commissioner Review, August 7, 1980).

On appeal to the superior court, the Commissioner of Labor's decision was affirmed.

1. AS 23.20.010.

The superior court held that the Commissioner's construction of AS 23.20.380(9)

> which would deny benefits to employees who voluntarily leave their work at a factory at which there is a labor dispute [2]

comported with both the statutory text and the express policy of AS 23.20.010.[3] In so holding the trial court concluded that the employees' position was not logical for under their "construction the unsuccessful striker (one whose efforts do not stop the employer's operation) is subsidized with benefits while the successful striker (one who shuts down the employer's operation) is denied those benefits." *Id.* at 5.

I am persuaded that the Commissioner of Labor and the superior court's construction of AS 23.20.380(9) is consistent with the legislature's stated policy of ameliorating the lot of those who are involuntarily unemployed. I fail to perceive any measure of logic in an interpretation of AS 23.20.380(9) which draws a line between workers who shut down an employer's operation and workers who are unsuccessful in shutting down their employer's business. An award of benefits to striking workers cannot be harmonized with the underlying purpose of the statute. If the legislature had intended unemployment compensation to serve as a substitute for a union strike fund it seems inconsistent to me for the legislature to have further provided benefits for workers who were not participating in the strike.[4] I would thus affirm the Commissioner of Labor's construction of AS 23.20.380(9).

---

2. *Twenty-Eight (28) Members of Oil, Chemical and Atomic Workers Union, Local # 1-1978 v. Employment Security Division of Alaska Department of Labor,* No. 3 AN 80-6198, Slip. Op. at 4 (Alaska Super.Ct., Third Judicial District, May 11, 1981).

3. In affirming the Commissioner's decision, the superior court ruled in part upon the provisions of AS 23.20.380(9)(A), (B) and (C). These sections generally provided exemptions from the stoppage of work denial of benefits found in AS 23.20.380(9), and read as follows:

> *Disqualification for benefits.* An insured worker is disqualified for waiting-week credit or benefits for a week of his unemployment if with respect to the week the department finds that
>
> . . . .
>
> (9) during the week unemployment is due to a stoppage of work because of a labor dispute at the immediate factory, establishment, or other premises at which he is or was last employed; for the purposes of this section, each separate department of the same premises which is commonly conducted as a separate business in separate premises is considered a separate factor, establishment or other premises; this subsection does not apply if the department finds that
>
> (A) he was not participating in or directly interested in the labor dispute which caused the stoppage of work, and
>
> (B) he did not belong to a grade or class or workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurred any of whom were participating in or directly interested in the dispute; or
>
> (C) the labor dispute is caused by the failure or refusal of an employer to conform to the provisions of an agreement or contract between employer and employee, or a law of the state or of the United States pertaining to hours, wages or other conditions of work; or
>
> . . .

4. *See* AS 23.20.380(9)(A) and (B), note 3, *supra.*